IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

1

2

3   BRUCE ALLEN LILLER, et al    :

4        Plaintiffs              :

5        vs.                     :

6   ROBERT KAUFFMAN, et al       :
         Defendants and              Case No. MJG 02-CV-3390
7        Third-Party Plaintiffs  :  (Consolidated w/MJG 02-CV-3391)

8        vs.                     :

9   ROGER LEE HELBIG             :

10       Third-Party Defendant   :

11                               :

12

13            * * * * * * * * *

14

15       Deposition of ROBERT D. KAUFFMAN, taken on

16  Wednesday, December 17, 2003, commencing at

17  approximately 10:14 a.m., at the law offices of Michael

18  Cohen, 213 Washington Street, Cumberland, Maryland,

19  21502, before Christina D. Pratt, Notary Public.

20

21            * * * * *

22

Word for Word Reporting
Swanton, MD 21561
301-387-8414

---

Page 2

APPEARANCES:

1

2     ARNOLD F. PHILLIPS, ESQUIRE

3     Attorney at Law

4     P. O. Box 537

5     McHenry, Maryland 21541

6         on behalf of Bruce Liller, Michael Liller

7         and Mary & Dwight Liller as Guardians for

8         Michael Liller

9

10    KATHLEEN M. BUSTRAAN, ESQUIRE

11    Lord & Whip

12    36 South Charles Street, 10th Floor

13    Baltimore, Maryland 21201

14        on behalf of Robert Kauffman & Joseph Kauffman

15

16

17   ALSO PRESENT:

18    Joseph Kauffman

19

20

21

22

Word for Word Reporting
Swanton, MD 21561
301-387-8414

---

Page 3

1              ROBERT D. KAUFFMAN

2   having affirmed that he would tell the truth, the

3   whole truth, and nothing but the truth, testified as

4   follows:

5            EXAMINATION BY MR. PHILLIPS:

6       Q.  Mr. Kauffman, my name's Arnold Phillips.  I

7   represent Bruce and Michael Liller in this matter, and

8   we're here to take your deposition.  Depositions are

9   just to, you know, get information, get all the facts

10  so everybody involved can help arrive at the truth as

11  to exactly what happened.

12          A couple things I'll ask you or the main thing

13  I'll ask you is wait until I finish the question before

14  you give an answer on this.  While at trial, I

15  generally use a lot of questions that would ask for a

16  yes or no, I have no problem with you elaborating and

17  explaining what happened or what went on.  We just want

18  to get your side of the story in all this.

19          First, let me get you to state your name and

20  address.

21      A.  Robert D. Kauffman, 2501 Glade Pike, Mann's

22  Choice, PA.

Word for Word Reporting
Swanton, MD 21561
301-387-8414

---

Page 4

1       Q.  How long have you been a resident of

2   Pennsylvania?

3       A.  I think it's been like three years -- four,

4   maybe four.

5       Q.  Where did you live before that?

6       A.  In Swanton, Maryland.

7       Q.  Swanton, Maryland?  Okay.  Is it anywhere near

8   the site of the accident that you lived before?

9       A.  That was about 17 miles from the site of the

10  accident.

11      Q.  Seventeen miles from the site of the accident.

12      A.  And before we lived there, we lived at the

13  site of the accident.

14      Q.  Oh, okay, so that used to be your home?

15      A.  Yes.

16      Q.  Do you have a current driver's license?

17      A.  Yes.

18      Q.  Is that a CDL license?

19      A.  Yes.

20      Q.  When did you get your driver's license?

21      A.  When I was 16.

22      Q.  And that was in the State of Maryland?

Word for Word Reporting
Swanton, MD 21561
301-387-8414



EXHIBIT

C

Page 5

1     A.   Yes.

2     Q.   When did you turn that -- when did you change

3 over to Pennsylvania license?

4     A.   Four years ago or whenever I moved to

5 Pennsylvania.  I think it was like four years ago.

6     Q.   Did you take your CDL tests in Pennsylvania?

7     A.   Yes.

8     Q.   Did you pass them the first time?

9     A.   Yes.  Well, the written test I did; the

10 driving test, I didn't.

11     Q.   Okay.  And what's your driver's license

12 number?  Do you have that with you today?

13     A.   26099026.

14     Q.   Prior to this accident, have you had any

15 moving violations?

16         MS. BUSTRAAN:  Objection; you can answer.

17     A.   Speed.

18     Q.   When was that?

19     A.   I'm not sure.  I know it's been a few

20 different times, but I'm not sure of dates, not

21 recently.

22     Q.   How many times have you had speeding tickets?

Page 6

1 I'll grant you a continuing objection.

2         MS. BUSTRAAN:  Objection; you can answer.

3     A.   I'm not sure.

4     Q.   Was it over five times?

5         MS. BUSTRAAN:  Objection.

6     A.   Offhand, I'm not sure.  I'd say probably

7 somewhere around there.

8     Q.   Any times while driving a commercial vehicle?

9         MS. BUSTRAAN:  Objection.

10     A.   I think one time or so.

11     Q.   Have you had any non-moving violations such as

12 a DUI or DWI?

13         MS. BUSTRAAN:  Objection.

14     A.   No.

15     Q.   Are you covered under -- well, actually, who

16 owned the truck that you were driving on, I believe it

17 was April 20th of 2001?

18     A.   My father.

19     Q.   Your father?

20     A.   Joseph Kauffman.

21     Q.   And what capacity were you driving the truck?

22 Were you employed by him or were you borrowing the

Page 7

1 truck?

2     A.   I'm employed by him; however, that date --

3 what we were doing on that date didn't have anything to

4 do regards to work.  It was not work related.

5     Q.   What was the purpose of your trip?

6     A.   Do you want the whole day or just that

7 evening, specifically?

8     Q.   Go ahead and state the whole day.

9     A.   We left the evening before to take a friend's

10 car that was broke down to meet her father halfway down

11 to Tennessee.  He brought some lumber up for my

12 grandfather.  We brought the lumber up, delivered it to

13 my grandfather's place, which was not my grandfather

14 where the accident occurred.  This was my other, my

15 maternal grandfather.  And then I went to my uncle's

16 place for supper, just had a relaxing afternoon, and we

17 went to my grandfather's place in the evening to pick

18 up a skid loader that we had there, because we were

19 helping him build a shed.  His garage had burned down,

20 and so we were leaving there in the evening when the

21 accident occurred.

22     Q.   What time did you begin your day?

Page 8

1     A.   I'd say probably 9:00 or so in the morning,

2 just roughly.

3     Q.   Approximately how many miles or how many hours

4 did you drive during the day?

5     A.   I don't know the mileage.  I'd say the total

6 hours up to then would have probably been maybe four.

7     Q.   You had dinner at your grandfather's?

8     A.   At my uncle's place.

9     Q.   At your uncle's place, okay.  Did you have

10 anything to drink while you were there?

11     A.   No -- water.

12     Q.   Had you had anything to drink in the 24 hours

13 preceding the accident?

14     A.   No.

15     Q.   At your uncle's residence, how long did you

16 live there before?

17     A.   You say at my uncle's residence?

18     Q.   Yeah, the residence -- that's where you had

19 dinner, at your uncle's residence?

20     A.   Uh-huh.

21         MS. BUSTRAAN:  Is that a yes; you can't say

22 uh-huh.

Page 9

1    A.   That was a few miles from where the

2    accident --

3        MS. BUSTRAAN:  No, no.  I appreciate your

4    answer.  I just -- excuse me for interrupting, but we

5    need you to give verbal answers rather than answer by

6    shaking your head or saying uh-huh, just so the court

7    reporter can correctly get your testimony.  Okay?  I'm

8    sorry.  Thank you.

9        Q.   So you had dinner at your uncle's, then drove

10   to your grandfather's?

11       A.   Yes.

12       Q.   Who owned the skid loader?

13       A.   My father.

14       Q.   Your father.  Is that something that's used in

15   his business?

16       A.   Yes.

17       Q.   Were you picking it up to return it to your

18   father for his business purposes?

19       A.   Yes.

20       Q.   I guess you weren't being paid that day?

21       A.   No.

22       Q.   Were you being paid at any part of the day?

Page 10

1    A.   No.

2    Q.   Did anybody tell you or instruct you to pick

3    up the skid loader?

4    A.   I can't remember.  I think we just decided --

5    I think I just decided myself it would work out good,

6    since I was up there anyway, just to drop in there and

7    pick it up.

8    Q.   Did you have any jobs that the skid loader was

9    going, where it was going to go to?

10   A.   No.

11   Q.   What people were present at your grandfather's

12   house?

13       MS. BUSTRAAN:  The day of the accident?

14   Q.   The day of the accident.

15   A.   My grandfather, my grandmother, my uncle, and

16   my aunt, and my wife was with me, and my cousin and his

17   wife live right across the road, and they were there,

18   too.

19   Q.   At the time of the accident, was anybody

20   riding with you?

21   A.   My wife.

22   Q.   Your wife, okay.

Page 11

1    A.   And she was three months pregnant, if that

2    accounts for anything.

3    Q.   Okay.  I take it she didn't have any injuries

4    from the accident; everything went okay with the

5    pregnancy?

6    A.   Yes.

7    Q.   Girl or boy?

8    A.   Girl.

9    Q.   First one?

10   A.   Yeah.

11   Q.   Okay.  I've got a girl myself, so -- okay.

12   Let's see, do you have your own auto insurance policy?

13   A.   Yes.

14   Q.   Who is your auto insurance policy with?

15   A.   It's Mennonite Fellowship Churches of PA.

16   Q.   Do you know what your policy limits are?

17   A.   I have no idea.

18   Q.   Do know if it covers you as far as your

19   driving your father's truck at all?

20       MS. BUSTRAAN:  I'll object and you can answer,

21   if you know.

22   A.   I don't think so.

Page 12

1    Q.   Did you report this accident to your insurance

2    company?

3    A.   No.

4    Q.   Do you have any other insurance policies, such

5    as an umbrella policy?

6    A.   No.

7    Q.   How long have you been employed with your

8    father?

9    A.   I think it's been about three years.

10   Q.   What are your duties?

11   A.   I'm mostly involved in sales and job site

12   management.

13   Q.   Okay.  What do you sell?

14   A.   Metal roofing and siding.

15   Q.   How much time do you spend driving tractor-

16   trailers?

17   A.   Now or --

18   Q.   As part of your job and up to the date of the

19   accident?

20   A.   When you're saying tractor and trailer, you're

21   referring to just a regular pick-up?

22   Q.   Yeah, a big rig with a trailer on it, either a

Page 13

1  flatbed or a box?

2      A.  When you're saying big rig, you're talking

3  class A?

4      Q.  18-wheeler.

5      A.  We don't have any of those.

6      Q.  What type of vehicle were you driving on the

7  day of the accident?

8      A.  Just simply a pick-up with a flatbed trailer,

9  and as I stated, we do have CDL license, even though

10 they weren't required for that.

11     Q.  Do you know if the pick-up or the flatbed are

12 listed as commercial vehicles?

13     A.  I think they are as soon as you cross the

14 state line.  I'm not exactly sure on that, but I think

15 so.

16     Q.  How much time or how much experience do you

17 have driving that pick-up with the flatbed attached?

18     A.  I used to do it full-time for about, a little

19 over a year, and I do it off and on now maybe 10-15,000

20 miles a year, at the most.

21     Q.  What year did you do it full-time?

22     A.  '97-'98.

Page 14

1      Q.  As far as your operation of the pick-up with

2  flatbed, were you ever involved in any other accidents?

3          MS. BUSTRAAN:  Objection.

4      A.  No.

5      Q.  Have you been involved in any accidents with a

6  regular vehicle?

7          MS. BUSTRAAN:  Objection.

8      A.  No.

9      Q.  On the date of the incident, what people were

10 present that you know of, that saw what happened?

11     A.  My wife and I and my uncle are the only ones

12 I'm aware of that actually witnessed the accident.

13     Q.  And your wife was seated in the truck next to

14 you?

15     A.  Yes.

16     Q.  Where was your uncle?

17     A.  He was standing in the lawn in front of the

18 house.

19     Q.  Now, when you left, describe the type of road

20 that you were leaving from.

21     A.  It was a driveway, a private driveway.

22     Q.  About how wide was it?

Page 15

1      A.  I'd say 12-14 feet.

2      Q.  How much room did you have with the pick-up

3  and the flatbed to get through there?

4      A.  As far as on either side of it?

5      Q.  Yes.

6      A.  Well, the pick-up and the flatbed would be 8

7  foot wide, so let's say maybe 6 feet, 3 feet on either

8  side.

9      Q.  Is there any -- when that driveway hits the

10 road, does it widen out at all or does it stay narrow?

11     A.  I can't really recall.  It might somewhat.

12 I'm not sure.

13     Q.  Now, are you able to pull out of that driveway

14 with the pick-up and flatbed without traveling into the

15 opposite travel lane?

16     A.  No.

17     Q.  Are you able to pull the truck out and the

18 flatbed without being able to completely block the

19 opposite travel lane and go onto the shoulder?

20     A.  Probably not, no.

21     Q.  Do you know anything about the condition of

22 that vehicle?

Page 16

1          MS. BUSTRAAN:  What vehicle?

2      Q.  The pick-up and the flatbed.

3      A.  As far as mechanically?

4      Q.  Yes.

5      A.  As far as I know, we're pretty strict with our

6  maintenance and everything, and everything was good.

7  There wasn't anything wrong with it anywhere, as far as

8  I know.

9      Q.  Who does the maintenance on it?

10     A.  We do some of it ourselves.  My brother's

11 responsible for all the maintenance, but we get it --

12 everything has to be inspected once a year.  There's

13 about three different garages we work with on that.

14     Q.  Do you know when the pickup was last

15 inspected?

16     A.  No, I don't.

17     Q.  What type of inspection does the flatbed need,

18 the trailer?

19     A.  Just the regular annual inspection.

20     Q.  Do you have any idea when that was last

21 inspected?

22     A.  No, I don't -- sometime within the year.

Page 17

1    Q.  Now, if you could, just go ahead and -- on the

2  accident, describe in your words what happened.

3    A.  We were just -- it was after dark and we were

4  just ready -- we just went to leave from there, and we

5  knew pulling out -- I knew pulling out I have to cross

6  both lanes of traffic.  And after dark, you can

7  actually see further, because you can see headlights

8  for a little bit before you pull out, and I knew I had

9  plenty of time to get out and make the turn I needed

10  to, you know.  Being aware that you need to cross two

11  lanes of traffic, you definitely want to be safe.

12    We pulled out and we were -- well, before we

13  got in the truck, I did a walk-around inspection of the

14  vehicle, made sure all the lights were working.  When

15  we buy our trucks and trailers from the factory, we're

16  not satisfied with the lights that come from the

17  factory.  We install about four times the amount they

18  have on it.  And I did a walk-around inspection.  Every

19  single light on the truck and trailer was working.

20    I got in the truck and I pulled out, and as we

21  were out, probably about center on the yellow line, my

22  wife said that she sees headlights coming over the

Page 18

1  hill, and I looked and I said I also saw the

2  headlights, but we had both looked before we pulled

3  out.

4    There was nothing coming; there was no

5  headlights, but as we got out on the yellow line, she

6  said there's headlights; you'd better hurry.  And so I

7  just stepped on the throttle to try to get on out, and

8  even then it shouldn't have -- there shouldn't have

9  been no problem at all, but before we could almost

10  think, the headlights just popped over the hill and

11  smashed into the side of the trailer -- no brake lights

12  or swerving or anything, no reaction.

13    Q.  How long did it take from the time that you

14  saw the headlights until the time it impacted the

15  trailer?

16    MS. BUSTRAAN:  Objection.

17    A.  It seems like -- it seemed like a second or

18  two.  It was just almost instant.  I almost didn't have

19  time to think.

20    Q.  Now, you're familiar with that intersection

21  from living there?

22    A.  Yes.

Page 19

1    Q.  And you --

2    A.  We didn't actually live at the place where I

3  was pulling out of -- sorry to interrupt, but we lived

4  across the road where my cousin now lives.

5    Q.  So I guess you're aware that there's not a

6  whole lot -- there's not much sight distance as you

7  crest the hill coming into where that residence is?

8    MS. BUSTRAAN:  Objection.

9    A.  Right, there's not a whole lot, but the speed

10  limit there is 45 miles an hour, so if somebody's going

11  the speed limit and everything, everything was -- if we

12  had known there was going to be a problem, we could

13  have put somebody out on the hill to watch or something

14  like that.

15    Q.  Have you ever put anybody out on the hill to

16  watch pulling trailers out of there at other times?

17    A.  Not there.  We have at other places.

18    Q.  What other places have you taken that

19  precaution?

20    A.  Up in Pennsylvania on some back roads.  I

21  couldn't remember any road names or anything.

22    Q.  Is it standard practice for you to post a

Page 20

1  lookout or do anything --

2    A.  Not necessarily -- I'm sorry.

3    Q.  -- when pulling out on blind corners?

4    A.  Not necessarily, because sometimes you're by

5  yourself, but we just try to make sure we don't pull

6  out somewhere if it's too dangerous.

7    Q.  Are you aware that there are laws that require

8  you to, you know, post a lookout or to put flares out

9  on the road when you're coming in an area with limited

10  visibility?

11    MS. BUSTRAAN:  Objection.

12    A.  No.

13    Q.  No?  Okay.  Did you receive any citations as a

14  result of the accident?

15    A.  Yes.

16    Q.  What citations did you receive?

17    MS. BUSTRAAN:  Objection; you can answer.

18    A.  I can't even remember what they were.  I think

19  one was failure to drive right of center.  I think

20  negligent driving.  I don't remember what the third one

21  was -- failure to, something about -- I can't remember

22  what it was, about not having an accident happen.  I

Page 21

1 can't remember how it was worded.

2    Q.  As a result of those charges, you retained an

3 attorney?

4        MS. BUSTRAAN:  Objection.

5    A.  Yes.

6    Q.  And you went to the District Court of Maryland

7 in front of Ralph Burnett for your trial?

8    A.  Yes.

9    Q.  And what was -- did you have a trial on the

10 charges?

11    A.  No.

12    Q.  Did the State's Attorney drop the charges?

13    A.  Yes.  I guess it was the State's Attorney.

14 I'm not really familiar with all the terminology.

15    Q.  Has your license to operate a vehicle ever

16 been suspended or revoked for any reason?

17    A.  No.

18    Q.  Do you have any restrictions on your license

19 such as eyeglasses or --

20    A.  No.

21    Q.  Do you wear eyeglasses at all?

22    A.  I did for about a year or so for headaches,

Page 22

1 but as a rule, I don't.

2    Q.  Is that because of nearsightedness or

3 farsightedness?

4    A.  Actually neither.  I think it had something to

5 do with my color perception, and I guess they thought

6 that's why I was maybe getting some headaches.

7    Q.  When did you wear the glasses?

8    A.  I think it was about three years ago.

9    Q.  Do you know what the make, model, and year of

10 the truck was?

11    A.  It was a 1997 Dodge pick-up truck.

12    Q.  Did your father's business buy it new?

13    A.  No.

14    Q.  When was it purchased?

15    A.  1997.  Well, he would have bought it in --

16 actually, it's the truck I'd driven when I drove full-

17 time for another fellow and then we bought it off of

18 him -- in what year?

19        MS. BUSTRAAN:  If you don't know, just say.

20        THE WITNESS:  I'm not sure.

21    Q.  How many miles did it have on it at the time

22 of the accident?

Page 23

1    A.  I'm not sure.

2    Q.  Do you have an approximate amount?

3    A.  I'd say probably 190,000, somewhere in that

4 range.

5    Q.  Do you know how many miles it had been driven

6 -- approximate mileage it had been driven in the

7 previous year?

8    A.  No, I don't -- maybe 30,000.  That's just a

9 rough idea.

10    Q.  And the vehicle had a current inspection

11 sticker?

12    A.  Yes.

13    Q.  How about the flatbed, do you know the year of

14 that?

15    A.  No, I don't.  I think it's like a '90 -- well,

16 actually, it would be like a, probably 2000 or 2001,

17 something like that.

18    Q.  Was there any damage to the truck as a result

19 of the accident?

20    A.  There was some damage to the bed, yes.

21    Q.  Was that damage repaired?

22    A.  Yes.

Page 24

1    Q.  How about the -- actually, who repaired the

2 truck?

3    A.  Martin's Welding.

4    Q.  Martin's Welding?  Did anybody take -- did you

5 or anybody that you know of take any pictures of the

6 truck between the time of the accident and the time

7 that it was repaired?

8    A.  Yes.

9    Q.  Who took those pictures, and where would they

10 be located?

11    A.  I took some myself the evening of the

12 accident, and I know either the Sheriff's Department

13 or the State Police had taken some.  My attorney has

14 the photos that I took.

15    Q.  The flatbed, did you take any pictures of

16 that?

17    A.  Yes.

18    Q.  Was the flatbed repaired?

19    A.  No.

20    Q.  Where's the location of the flatbed now?

21    A.  It's in our business location in Bedford,

22 Pennsylvania.

Page 25

1   Q.   Has anything been done to the flatbed since

2   the time of the accident?

3   A.   No.   We've taken the tires off of it to re-use

4   them, but the flatbed was totaled.

5   Q.   How many other flatbeds does your father own?

6   A.   Three.

7   Q.   How many other trucks does your father own?

8   A.   Is it four?

9        MR. PHILLIPS:   If you don't know, you know,

10  you don't need to ask.   Just tell me you don't know.

11       THE WITNESS:   I think it's four.

12  Q.   And do they all --

13  A.   That includes -- I'm sorry.   That includes

14  half-ton -- the half-ton run-around trucks, or

15  whatever.

16  Q.   As far as moving heavy equipment, do you have

17  any other heavy equipment other than the Bobcat that

18  was on the flatbed?

19  A.   At the time?

20  Q.   Yes.

21  A.   No.

22  Q.   And what was the Bobcat being used for at, I

Page 26

1   believe, your grandfather's residence?

2   A.   Yeah, his barn or workshop had burned down,

3   and we just had it down there for some clean-up and to

4   re-grade it to pour concrete for a new building.

5   Q.   Do you have any repair bills for the truck?

6   A.   I'm not sure, probably somewhere.

7   Q.   Do you have any idea how much it cost to

8   repair the truck?

9   A.   No, I don't.

10  Q.   Now, going back to the accident, there was a

11  point where you and your wife saw the headlights

12  approaching.   How far out in the road were you at the

13  point you first saw headlights approaching?

14  A.   We were at the -- I'd say our seat, the seat

15  we were sitting on was probably on the yellow line in

16  the center of the road.

17  Q.   What gear were you in?

18  A.   I'm sure I was in first.

19  Q.   And this was a diesel truck?

20  A.   Yes.

21  Q.   Did your wife see -- you said your wife saw

22  the lights before you saw the lights?

Page 27

1   A.   Yes.

2   Q.   What direction were you looking when she saw

3   the lights?

4   A.   I was looking both ways, but I think when she

5   first said she saw them, I was looking the other way.

6   I had told her to watch as we were pulling out to make

7   sure nothing's coming the other way.

8   Q.   I take it those lights would have been coming

9   from the left?

10  A.   From the right.

11  Q.   The right, okay.   And you were taking a left-

12  hand turn?

13  A.   A right.

14  Q.   You were taking a right-hand turn, okay.   And

15  how much visibility did you have as far as distance?

16  A.   I'm not sure.

17       MS. BUSTRAAN:   If you don't know, don't guess.

18       THE WITNESS:   I'm not sure how much it was.

19  Q.   Have you ever been involved in any other legal

20  actions other than this one?

21       MS. BUSTRAAN:   Objection.

22  A.   No.

Page 28

1        MS. BUSTRAAN:   You mean other than that

2   criminal issue he told you about earlier, also?

3        MR. PHILLIPS:   Yes.

4   Q.   Have you made any notes or memorandum about

5   this accident?

6   A.   I have some photos and I have a file at home

7   that has the police report and different things like

8   that in it.

9   Q.   What else beside the police report?

10  A.   I'm trying to think, probably just maybe

11  paperwork from the attorney and some of that sort of

12  thing.   I can't really remember offhand.

13  Q.   Do you have any written statements that you

14  made regarding the accident?

15  A.   I don't think I do.   I know the Sheriff's

16  Department had one, but I don't think I have a copy of

17  it.

18  Q.   After the collision, did you return to your

19  same job?

20  A.   Yes.

21  Q.   Do you still drive that pick-up truck with the

22  flatbed on it?

Page 29

1    A.   Yes.

2    Q.   What purposes do you use the flatbed for?

3    A.   Mostly for delivering roofing and siding

4    materials.

5    Q.   Does your business construct the roofing and

6    siding or --

7    A.   Yes.

8    Q.   Did you have any people investigate this

9    accident for you?

10   A.   No.

11   Q.   After the accident, what did you do?

12   A.   I just -- I had a cell-phone right there in

13   the truck, and before I got out of the truck, I called

14   911, because I knew -- and they came like a bullet, so

15   I knew it was going to be bad.  And I called 911 and my

16   grandfather and my cousin came running right away, and

17   they went up to the car, so I knew they were taking

18   care of whoever was there, so I just grabbed some

19   flares out of the toolbox and ran out and put some

20   flares up in both directions.  Then I went back to the

21   car and just made sure it wasn't on fire or anything.

22   Q.   Did your truck move at all after the impact,

Page 30

1    prior to emergency vehicles showing up?

2    A.   No.

3    Q.   I take it then the place where the Sheriff's

4    Department saw the vehicle, and pictured, that's the

5    exact spot where the accident occurred?

6    A.   Yes.

7    Q.   Did you hear any brakes or any squealing prior

8    to the accident?

9    A.   No.

10   Q.   What did your wife say at the time of the

11   accident?

12   A.   I have no idea.  I know she was pretty shook

13   up.

14   Q.   Did you make any statements?

15   A.   Not that I -- I don't know.  I have no idea.

16   Q.   Did you walk over to the vehicle that had hit

17   your truck at any point?

18   A.   Yes.

19   Q.   Were the passengers conscious, to your

20   knowledge?

21   A.   One was -- one seemed to be conscious.  He was

22   begging for us to get him out, and we didn't want to

Page 31

1    touch him unless he was on fire or something, but the

2    other two were -- I don't think were conscious.

3    Q.   The one that was conscious would have been in

4    the right passenger's seat?

5    A.   Yeah, I think so.

6    Q.   What was he saying?

7    A.   He was just begging for us to open the door

8    and get him out and help me out of the car, and we just

9    told him to wait until the rescue crews arrived.  I

10   don't think he was fully conscious, because I think

11   when they hauled him out, then I think he was

12   unconscious.  I'm not sure.  I do know he was begging

13   for us to get him out.  That's about the only thing I

14   remember.

15   Q.   So you were authorized by your dad to be

16   driving the truck that day?

17   A.   Yes.

18   Q.   Okay, and you were authorized by your dad to

19   pick up the Bobcat?

20   A.   I didn't call him or anything, but yeah, I'm

21   sure it was no problem.

22   Q.   When you did that, you were essentially

Page 32

1    helping out the -- doing a job which would need to be

2    done for the business regardless?

3    MS. BUSTRAAN:  Objection.

4    A.   Not necessarily.  It was basically a personal,

5    personal day the whole day, and like I said, we were

6    helping my grandfather there with the rebuilding of his

7    shop that had burned down, and so I just picked it up

8    there.

9    Q.   But if you didn't pick it up, your father

10   would have had to pay somebody or send somebody over to

11   pick up the Bobcat?

12   MS. BUSTRAAN:  Objection.

13   A.   Probably, yeah.

14   Q.   Were you and your wife injured at all?

15   MS. BUSTRAAN:  Objection.

16   A.   No.

17   Q.   Did you go to the hospital at all?

18   A.   No.

19   Q.   Did you miss any work as a result of the

20   accident?

21   A.   Maybe a day or so.

22   Q.   And why did you miss work?

Page 33

1     MS. BUSTRAAN:  Objection; why is this

2  relevant?

3     MR. PHILLIPS:  It could lead to relevant

4  information.

5     MS. BUSTRAAN:  I don't think it can.  I think

6  you're stretching.  Go ahead; you can answer if you

7  know.  I object.

8     A.  I don't know.  It was just really late until

9  we got everything cleaned up and so I think we got home

10  really late that night and went back to Pennsylvania,

11  and I don't think I worked the next day.

12     Q.  Who have you talked about the accident with?

13     A.  Well, I talked to a lot of different people.

14  I mean, specifically, authority-wise or --

15     Q.  Yes.  Who have you given an account of the

16  accident to?

17     A.  I'm sure most of the family members.  There

18  was a few different ones from the Sheriff's Department,

19  the attorney.  I don't remember who all.  I know there

20  would have been a lot of people.

21     Q.  Okay.  Are you aware of any of the experts

22  that you'd be calling in trial?

Page 34

1     A.  Experts as in?

2     MS. BUSTRAAN:  As in expert witnesses?

3     MR. PHILLIPS:  Yes.

4     A.  Do you want like a number of how many?

5     Q.  Yes, anybody that you know of that is going to

6  be an expert in a trial.

7     A.  An expert is just any witness?

8     Q.  No, an expert is a witness who has specific

9  knowledge.  It could be a doctor, investigator on the

10  scene, anybody who's essentially being paid to help

11  find or determine the cause of the accident or results

12  of the accident.

13     A.  Not as far as I'm concerned, no.

14     MS. BUSTRAAN:  Well, obviously, you know that

15  we identified expert witnesses?

16     MR. PHILLIPS:  Yes, I'm aware of that.

17     Q.  Have you discussed this accident with any

18  expert witnesses or any people to help determine the

19  cause, other than the officers that were there at the

20  scene?

21     A.  No.

22     Q.  Now, in the Complaint or in your Answer to the

Page 35

1  Complaint, you had denied that you were aware the

2  headlights were approaching as you exited the driveway?

3     A.  Right.

4     Q.  But you did see while you were in it, on

5  route, you saw the headlights approaching?

6     A.  Right.  If we would have stopped right there,

7  he would have hit the passenger's side door.

8     Q.  How much time from the time you saw the

9  headlights to the time that they made contact with the

10  vehicle?

11     MS. BUSTRAAN:  I object; I think that's been

12  asked and answered.

13     A.  Yeah, I think you asked that before.  I'm not

14  sure.  I just thought it was quick, almost too quick to

15  even respond.

16     Q.  About how fast would you estimate you were

17  traveling?

18     A.  I'm not sure.

19     MS. BUSTRAAN:  At what point?

20     Q.  At the point of impact?

21     A.  I'm not sure.  I'd have to -- I'd almost have

22  to get in the truck and just do it again just to get a

Page 36

1  rough idea, just an average speed of pulling out of the

2  driveway.  I'm not sure what that would be.

3     Q.  And the type of truck you have, how fast do

4  you believe you can go in first gear?

5     A.  I'd say probably 15 miles an hour or so, 15 to

6  20, 25.  I'm not sure.  I'd have to actually check it

7  out.

8     Q.  Okay.  And as that -- as the vehicle came over

9  the hill, would it have any reasonable chance of

10  getting around you?

11     A.  I'm not sure.  On the back side of the

12  trailer, it might have.

13     Q.  You mean behind the trailer?

14     A.  Behind the trailer, yeah.

15     Q.  How much room would you estimate was behind

16  the trailer?

17     A.  I'm not sure.

18     Q.  At the time of the accident, were you in the

19  travel lane of the other vehicle?

20     A.  Yes.

21     Q.  And were you blocking the shoulder by that

22  travel lane?

Page 37

1    A.   There was no shoulder on that road.

2    Q.   Okay.  And you made no actions whatsoever to

3 try to warn other vehicles or put a lookout out, other

4 than -- strike that.  Prior to leaving the driveway,

5 you took no precautions for any vehicles that would be

6 traveling in either direction?

7         MS. BUSTRAAN:   Objection; it's contrary to his

8 prior testimony.  You can answer again, if you can.

9    A.   No, we didn't.

10    Q.   The tractor-trailer, did that have the

11 registration number of YDF3242?

12    A.   I don't know.

13    Q.   It was registered in the State of

14 Pennsylvania?

15    A.   Yes.

16    Q.   Do you know of anything the other driver could

17 have done to avoid the accident?

18    A.   First of all, if he wouldn't have been

19 drinking and if he would have kept his speed to about

20 half of what he was, he would have been driving about

21 the speed limit, and he would have had no problem

22 seeing me or getting stopped.  And actually, I would

Page 38

1 have been -- from the time we saw -- from the time we'd

2 see headlights of somebody going the speed limit, we

3 could easily be pulled out of the driveway and out of

4 the lane before anybody gets there.

5    Q.   Did any other person, other than than you or

6 the other driver, contribute in any manner to the

7 accident, that you know of?

8    A.   Can you say that again?

9    Q.   Did any person other than you or the other

10 driver contribute towards the accident that you are

11 aware of?

12    A.   No.

13    Q.   Have you ever had your name changed for any

14 reason?

15    A.   No.

16         MR. PHILLIPS:   I believe that's all I have.

17         MS. BUSTRAAN:   We'll reserve the right to read

18 and sign.

19         (Whereupon, at 11:00 a.m., the taking of the

20 deposition was concluded.)

21

22         _____
              Robert Kauffman