IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MARYLAND

| | |
|---|---|
| BRUCE ALLEN LILLER, et al. | * |
| Plaintiff | Case No.: MJG 02-CV-3390 |
| | * (Consolidated with MJG 02-CV-3391) |
| v. | * |
| ROBERT KAUFFMAN, et al. | * |
| Defendants and Third-Party Plaintiffs | * |
| v. | * |
| ROGER LEE HELBIG | * |
| Third-Party Defendant | * |

\* \* \* \* \* \* \*

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION
IN LIMINE TO PRECLUDE TESTIMONY OF JEROEN WALSTRA**

Defendants, Robert Kauffman and Joseph Kauffman, by their undersigned counsel, pursuant to Rules 104 and 702 of the Rules of Evidence, file the following Memorandum of Law in support of their Motion to Preclude Testimony of Jeroen Walstra, and state:

**FACTUAL BACKGROUND**

This case arises from a motor vehicle collision in Oakland, Maryland. Jurisdiction in this Court is claimed pursuant to 28 U.S.C. § 1332.

The Plaintiffs allege that, on April 17, 2002, they were passengers in a vehicle being driven by Roger Lee Helbig and which was travelling west on Paul Friend Road. Defendant Robert Kauffman was, at the same time, the driver of a

pick-up truck with an attached flatbed trailer and was attempting to pull his vehicle and trailer into a driveway on Paul Friend Road. The truck and trailer were owned by Joseph Kauffman. Joseph Kauffman had previously given permission for Robert Kauffman to use the vehicles.

Plaintiffs have designated Jeroen Walstra as an expert witness who will provide testimony on their behalf at the trial of this case. Mr. Walstra's deposition was taken on December 15, 2003. Mr. Walstra is expected to offer opinions in this case with respect to lost earnings capacity on behalf of Plaintiffs Bruce Liller and Michael Liller (Plaintiffs' 26(a)(2) Statement, attached hereto as Exhibit A). For the reasons described below, the testimony of Mr. Walstra would not assist the trier of fact in this case to understand the evidence or to determine facts at issue, and further Mr. Walstra lacks appropriate qualifications as an expert, and therefore his testimony as an expert witness at the trial of this case should be precluded.

## ARGUMENT

Pursuant to Rule 702 of the Federal Rules of Evidence, "a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify with respect to scientific, technical, or other specialized knowledge, if that knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." In determining whether to admit such testimony, the Court must ensure that it is not only relevant, but reliable. Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 590, 113 S. Ct. 2786 (1993). An expert's opinion must have a reliable basis in the knowledge and experience of his

2

discipline.  Id. at 592.  Daubert's general holding, requiring that the Court, as gatekeeper, review proposed evidence for its relevancy and reliability, extends not only to testimony based on scientific knowledge, but to testimony based on technical and other specialized knowledge as well.  Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141, 119 S. Ct. 1167 (1998).

## I. Standard of Review

Rule 104(a) of the Rules of Evidence provides that "[p]reliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court . . . In making its determination it is not bound by the rules of evidence except those with respect to privileges."  These matters are to be determined by the Court based upon a preponderance of proof.  Bourjaily v. United States, 483 U.S. 171, 175-176, 107 S. Ct. 2775 (1987).

## II. Qualifications

The Plaintiffs have offered Jeroen Walstra, M.A., C.E.A., to testify with respect to their lost future earnings and the cost of future medical treatment (Plaintiffs' Rule 26(a)(2) Disclosure, attached hereto as Exhibit A).  In 1984, Mr. Walstra was awarded a Bachelor of Arts degree in Physical Education from the Academy for Physical Education in the Netherlands (Deposition of Jeroen Walstra, p. 5; Curriculum Vitae of Jeroen Walstra, attached hereto as Exhibit C). In addition, Mr. Walstra holds a Masters' Degree in Marketing, which he was awarded in 1990 from Webster University in Missouri (Deposition of Jeroen

3

Walstra, p. 5-6; Curriculum Vitae of Jeroen Walstra, attached hereto as Exhibit C). Apparently, the only academic qualifications held by Mr. Walstra which are relevant to his economic opinions in this case are a certificate in Dutch Law in Economics, which Mr. Walstra received in 1988, as well as post-Masters' credit at Melhurst College, performed in 1997, relating to vocational economic analysis and testimony (Deposition of Jeroen Walstra, p. 6). Mr. Walstra is also a certified earnings analyst, a certification awarded him by the American Rehabilitation Economics Association (Deposition of Jeroen Walstra, p. 6-7).

Mr. Walstra's employment history primarily concerns marketing and market forecasting (Deposition of Jeroen Walstra, p. 8-9). In 1990, Mr. Walstra began working for 3M Healthcare as marketing coordinator for surgical products, and simultaneously worked as an adjunct professor at Webster University in the Netherlands, teaching market forecasting (Deposition of Jeroen Walstra, p. 8). In 1994, Mr. Walstra moved to the United States, where he continued to work for 3M in export planning (Deposition of Jeroen Walstra, p. 8). Subsequently, Mr. Walstra left his position with 3M to form a consulting business with his partner and father-in-law, Charles M. Cohen, Ph.D., and "started writing reports for attorneys . . . regarding losses of earnings in personal injury cases and medical malpractice cases" (Deposition of Jeroen Walstra, p. 8-9). Mr. Walstra continues to do consulting work with a company called United Marketing Group, which involves advising small business about market forecasting, sales development, market share development, and so forth (Deposition of Jeroen Walstra, p. 9). Mr.

4

Walstra describes that work as making assessments about how many units a business could expect to sell in the future and projecting expected profits (Deposition of Jeroen Walstra, p. 9-10).

Mr. Walstra and Dr. Cohen market their consulting services to attorneys, representing that Dr. Cohen performs vocational and sometimes psychological evaluations, and that Mr. Walstra performs economic forecasting (Deposition of Jeroen Walstra, p. 12-13).

Mr. Walstra prepared reports for both Bruce Liller and Michael Liller (Deposition of Jeroen Walstra, p. 20, 38; Reports of Jeroen Walstra, attached hereto as Exhibits D & E). In connection with each report, Mr. Walstra reviewed Dr. Cohen's previously prepared report, the notes from his interviews with each Plaintiff, and each Plaintiffs' tax returns (Deposition of Jeroen Walstra, p. 20, 39-40).

### A. The Bruce Liller Opinions

Mr. Walstra met with Bruce Liller in order to determine his date of birth, the date of the accident at issue in this case, his educational background, his work history, his earnings history, and his current medical condition (Deposition of Jeroen Walstra, p. 20-21). Mr. Walstra determined that, prior to the accident at issue in this case, Mr. Liller earned $15.00 per hour, or $31,200.00 per year (Deposition of Jeroen Walstra, p. 22).[1] In addition, Mr. Walstra determined that,

---

[1] Immediately prior to the accident, Mr. Liller was earning $15.00 per hour (Report of Charles M. Cohen, Ph.D., p. 2, attached hereto as Exhibit F). In his employment prior to that, Mr. Liller earned $18.00 per hour (Report of Charles M. Cohen, Ph.D., p. 2, attached hereto as Exhibit F).

5

since returning to work in December, 2002, Mr. Liller has earned $15.00 per hour (Deposition of Jeroen Walstra, p. 21).

Inexplicably, Mr. Walstra bases his calculations with respect to Mr. Liller's projected earnings loss on his determination that Mr. Liller *could have* earned $23.00 per hour *prior* to the accident at issue in this case, based upon the national average wages for 2001 reported by the Bureau of Labor Statistics (Deposition of Jeroen Walstra, p. 22-23). This is despite the fact that it is undisputed that Mr. Liller was earning $15.00 per hour prior to the accident (Deposition of Jeroen Walstra, p. 23). Mr. Walstra opines that he used the $23.00 per hour figure because "that's what we felt [was] the wage that he could earn" (Deposition of Jeroen Walstra, p. 23). Although he agreed that people earn different wages in different jobs, Mr. Walstra did not think it significant that Mr. Liller had never actually earned $23.00 prior to the accident at issue, because he believed that "the most important thing . . . here is what he could be earning and not so much what he is earning at that moment" (Deposition of Jeroen Walstra, p. 24). Mr. Walstra did not perform any investigation to determine why Mr. Liller had previously earned $15.00 per hour in comparison with the national average of $23.00 per hour (Deposition of Jeroen Walstra, p. 25). In addition, he did not believe that an investigation with respect to the average wage for comparable work in Oakland, Maryland, where the Plaintiff currently resides and works, would be relevant to the preparation of his opinions (Deposition of Jeroen Walstra, p. 25). However, Mr. Walstra admitted that he "looked into" a database for Garrett County, where

6

the Plaintiff resides and works, and determined that the wage rates there were "somewhat lower" (Deposition of Jeroen Walstra, p. 26).[2]  Although it may be possible to obtain information about wages in Oakland, Maryland through other sources, Mr. Walstra would not know how (Deposition of Jeroen Walstra, p. 31).

Mr. Walstra's opinion in this case is based upon a determination that Mr. Liller works as a "first line supervisor/manager of construction trade" (Deposition of Jeroen Walstra, p. 31). However, Mr. Walstra did not independently determine whether that represented an appropriate employment classification for Mr. Liller, but rather based his determination solely on a report prepared by Dr. Cohen (Deposition of Jeroen Walstra, p. 31-32). Mr. Walstra agreed that the construction trade, in general, is sensitive to economic ebbs and flows, and further that the wages of construction workers are tied to the state of the economy (Deposition of Jeroen Walstra, p. 32). In fact, Dr. Walstra agreed that at many times, construction workers may not be able to find work at all (Deposition of Jeroen Walstra, p. 32). Although Mr. Walstra agreed that Mr. Liller's projected future earnings would be affected by economic ebbs and flows, he testified that his calculations of Mr. Liller's earning capacity would remain unchanged (Deposition of Jeroen Walstra, p. 32-33).

---

[2] Mr. Walstra testified that the database he accessed for information on wage rates in Garrett County was a computer program which was given to him by Billy J. McCroskey, who markets the software to vocational and economic professionals (Deposition of Jeroen Walstra, p. 28-30). Mr. Walstra testified that he could not print out the pages representing his research on the wage rates in Garrett County (Deposition of Jeroen Walstra, p. 27).

7

According to Mr. Walstra, the Plaintiff is entitled to recover damages representing what he *could* earn in the future, irrespective of market changes, the availability of work, and regardless of the fact that Mr. Liller has never demonstrated an ability to earn the wage level upon which Mr. Walstra bases his opinions. Any number of factors unrelated to the injuries he allegedly sustained in this accident could affect Mr. Liller's ability to work in the future. For example, Mr. Liller may suffer from health conditions, unrelated to this incident, which could affect his ability to work in the future. Nevertheless, Mr. Walstra testified that he did not obtain any information from Mr. Liller with respect to his medical condition (Deposition of Jeroen Walstra, p. 34, 36). Nor did Mr. Walstra ask about Mr. Liller's personal spending habits (Deposition of Jeroen Walstra, p. 34).

### B. The Michael Liller Opinions

Mr. Walstra determined that Michael Liller was earning $12.00 per hour prior to the accident at issue in this case, based upon Dr. Cohen's report, and that he is currently earning $8.00 per hour (Deposition of Jeroen Walstra, p. 39).

In addition, despite the fact that there is no evidence that a medical professional has prescribed psychotropic medication for Mr. Liller,[3] Mr. Walstra arbitrarily assumed that Mr. Liller would be prescribed Zoloft, a prescription antidepressant, and estimated that Mr. Liller's prescription costs for this medication would amount to $1,500 per year (Deposition of Jeroen Walstra, p. 42;

---

[3] Dr. Cohen indicated in his report that Michael Liller would require a range of psychological and medical treatment in the future, none of which has been actually prescribed or recommended for Mr. Liller by any physician (Deposition of Charles M. Cohen, Ph.D., p. 47-50).

8

Report of Jeroen Walstra, p. 3, attached hereto as Exhibit E). The basis for Mr. Walstra's opinion in this regard, apparently, is his review of a website called PopularPrescriptionDrugs.com (Deposition of Jeroen Walstra, p. 43).[4]

In addition, Mr. Walstra opined that the cost for a full neuropsychological assessment for Mr. Liller would be $1,000 (Deposition of Jeroen Walstra, p. 42; Report of Jeroen Walstra, p. 3, attached hereto as Exhibit E). Mr. Walstra was apparently quoted this fee by one neuropsychologist he contacted, whom he was unable to identify (Deposition of Jeroen Walstra, p. 44). Nevertheless, Mr. Walstra admitted it would have been more prudent for him to have investigated the cost for such an assessment with more than one provider (Deposition of Jeroen Walstra, p. 44-45).

### III. Reliability

To determine whether expert testimony is admissible under Rule 702, the Court must examine whether the reasoning or methodology underlying the expert's proffered opinion is reliable, meaning it is supported by adequate validation to render it trustworthy. Westberry v. Gislaved Gummi AB, 178 F.3d 257, 261 (4th Cir. 1999). The testimony must rest upon a reliable foundation and must be relevant. Kumho Tire, 526 U.S. at 141. As a gatekeeper of proffered testimony, the Court must keep in mind that expert witnesses have the potential to

---

[4] Mr. Walstra admitted that Zoloft represents but one example of a number of different classes of psychotropic medications which would be available for prescription to Mr. Liller, assuming any medical professional wished to prescribe such a medication for his use, and that within those classes of medications are generic medications, which would be less expensive (Deposition of Jeroen Walstra, p. 43-44). Mr. Walstra did not determine the cost of available generic medications (Deposition of Jeroen Walstra, p. 44).

be "both powerful and quite misleading." Daubert, 509 U.S. at 595. Where the expert testimony has a greater potential to mislead than to enlighten, that evidence may be properly excluded. Westberry, 178 F.3d at 261.

     In this case, Mr. Walstra has been offered as an economics expert to testify both with respect to the valuation of Plaintiffs' future wage losses and, presumably, their present value. Even a cursory review of Mr. Walstra's Curriculum Vitae supports the conclusion that Mr. Walstra is not qualified to render opinions in the area of economics. Mr. Walstra holds an undergraduate degree in Physical Education. He holds a Masters' degree in Marketing, and his employment experience, before forming a legal consulting company, dealt solely in market forecasting. Although Mr. Walstra testified that he is a certified earnings analyst, a certification awarded him by the American Rehabilitation Economics Association, and also holds a certificate in Dutch Law in Economics, Mr. Walstra's qualifications to render opinions on economics and projected wage losses are extraordinarily tenuous.

     Even setting aside Mr. Walstra's credentials, Mr. Walstra has provided very little in the way of foundation for the opinions he intends to express in this case. For example, although Mr. Walstra agreed that Bruce Liller has never previously earned $23.00 per hour as a construction worker, he testified that the national average of $23.00 per hour represented a better reference point for determining Mr. Liller's future wage loss. This simply makes no sense. If Mr. Liller never earned $23.00 per hour prior to sustaining the injuries he claims, he should

10

certainly not recover damages for future wage loss based upon that rate.  In addition, although Mr. Walstra agreed that wages in the construction industry are subject to economic fluctuations, and that construction workers are frequently unable to work, Mr. Walstra failed to account for any of those contingencies in his projections.  According to Mr. Walstra, even if construction work is not available for persons like Mr. Liller in the future, or if the wages available to them are significantly lower than $23.00 per hour, Mr. Liller should be compensated at a rate of $23.00 per hour for losses allegedly resulting from injuries related to this accident.

Just as a scientist would want to duplicate the outcome when evaluating a colleague's research, an economist assessing the Plaintiffs' projected wage losses would want to test and review the evaluation performed by Mr. Walstra in an attempt to reproduce the results he generated.  *See* Elcock v. Kmart Corp., 233 F.3d 734, 741 (2000) (holding that a vocational rehabilitationist would be precluded from testifying as an expert witness where his methods were unreliable).

Although an expert's testimony concerning post-injury earning capacity need not be mathematically exact, it must be based upon the proper factual foundation.  Elcock, 23 F.3d at 754; Benjamin v. Peters Farm Condominium Owners Assoc., 820 F.2d 640, 643 (3rd Cir. 1987).  The expert's testimony must be accompanied by a sufficient factual foundation before it may be submitted to a jury.  Elcock, 233 F.3d at 754; Gumbs v. International Harvester, Inc., 718 F.2d 88, 98 (3rd Cir. 1983).  Absent a factual foundation, such testimony is merely a

11

"castle made of sand." Benjamin, 820 F.2d at 643. *See also* Quinones-Pacheco v. American Airlines, Inc., 979 F.2d 1, 6 (1st Cir. 1992) (holding that "[b]ecause [the experts'] analysis was predicated on an assumption not supported by the record - the assumption that [the plaintiff] suffered from a permanent, total disability," the court correctly excluded the evidence); In Re: Air Crash Disaster at New Orleans, Louisiana, 795 F.2d 230, 233 (5th Cir. 1986) (holding that, where an economist failed to provide a factual foundation for his opinions concerning the collective loss of inheritance for three children, his testimony was properly excluded).

The Elcock case is instructive. In that case, the Third Circuit considered a vocational rehabilitation expert offered by the Plaintiff, who testified that, but for her injury, the Plaintiff could have earned a wage which was higher than the wages she had actually earned prior to her injury. Elcock, 233 F.3d at 754. The Court held that the expert lacked factual foundation for his opinions in that regard. Id. In addition, the Court determined that the expert's failure to consider "the real world" of the Plaintiff, who had a medical condition which was expected to affect her life span, rendered the expert's opinion inadmissible. Id. at 756. Where a jury would be likely to adopt the gross, unsupported figures advanced by an expert witness, the Court should not admit the testimony of the witness as evidence. Id. at 756. In addition, the Court held that "a lost future earnings expert who renders an opinion about a plaintiff's future economic harm based on economic assumptions not present in the plaintiff's case cannot be said to assist the trier of fact" as Rule 702 requires. Id. (internal citations omitted). *See also* 2 Stephen A.

12

Saltzburg, Michael M. Martin & Daniel J. Capra, Federal Rules of Evidence Manual 1272-75 (7th Ed. 1998) (collecting cases in which courts have excluded expert testimony offered by economists because their damages models did not fit with the facts in evidence).

Likewise, with respect to Michael Liller, Mr. Walstra opines concerning expenses associated with medical treatment which has never been recommended or prescribed for Mr. Liller. An expert should not depend on fictional or random data when rendering an opinion about the quantum of economic harm in a plaintiff's case. Elcock, 233 F.3d at 756. Permitting an expert witness to offer an opinion unsupported by factual foundation would significantly increase the risk of misleading a jury and confusing the issues in this case. Tyger Constr. Co. v. Pensacola Constr. Co., 29 F.3d 137, 144 (4th Cir. 1994). In addition, an expert's qualifications must match up with the subject matter about which he is to testify. Elswick v. Nichols, 144 Supp. 2nd 758, 766 (E.D. Ken. 2001). A witness' qualifications must provide a foundation for him to respond to a specific question. Id. at 766. Here, Mr. Walstra has absolutely no training whatsoever with respect to medicine or pharmacology. He is simply not qualified, and admits as much, to testify with respect to the appropriateness of any particular prescription medication for Mr. Liller.[5] Mr. Walstra's training and expertise does not qualify him to

---

[5] Indeed, Dr. Cohen, who "suggested" the treatment for Mr. Liller which is discussed in Mr. Walstra's report, admitted in his deposition that no medical professional has recommended or prescribed that treatment for Mr. Liller (Deposition of Charles M. Cohen, Ph.D., p. 49).

render an opinion with respect to the expense of any medication for Mr. Liller, and his opinions are therefore unreliable and inadmissible.

## CONCLUSION

Mr. Walstra, who holds degrees in Physical Education and Marketing, is not qualified to testify as an expert concerning the Plaintiffs' future economic wage losses.  Even assuming that this Court is willing to preliminarily qualify Mr. Walstra to testify as an expert, his testimony is not reliable and should be excluded.  Mr. Walstra bases his opinions in both cases on information not supported by the facts in the case, and further, reaches conclusions which are not reliable and which would substantially risk misleading the jury in the case.  Therefore, Mr. Walstra's testimony should be precluded from the trial of this case.

*/s/ Kathleen M. Bustraan*
Kathleen M. Bustraan
(Bar No. 24417)
Jennifer S. Lubinski
(Bar No. 25160)
Lord & Whip, P.A.
Charles Center South, 10th Floor
36 S. Charles Street
Baltimore, Maryland  21201
(410) 539-5881

Attorneys for Defendants

313178