1                          VOLUME II
              IN THE UNITED STATES DISTRICT COURT
2                FOR THE DISTRICT OF MARYLAND

3    BRUCE ALLEN LILLER, et al.

4            Plaintiffs
        vs.                        CIVIL ACTION NO.
5
     ROBERT KAUFFMAN, et al        MJG 02-CV-3390
6                                  (Consolidated with MJG
                                   02-CV-3391)
7            Defendants and Third-
             Party Plaintiffs
8    and

9    ROGER LEE HELBIG

10           Third-Party Defendant
     _____/
11           Volume II of the deposition of CHARLES M.

12   COHEN, PH.D. was held on Thursday, December 18, 2003,

13   commencing at 4:05 P.M., at the Law Offices of Lord &

14   Whip, 36 South Charles Street, 10th Floor, Baltimore,

15   Maryland 21201 before Louisa B. McIntire-Brooks, Notary

16   Public.

17   APPEARANCES:

18           ARNOLD F. PHILLIPS, ESQUIRE (via tele.)
                On behalf of Plaintiffs
19
             JENNIFER S. LUBINSKI, ESQUIRE
20              On behalf of Defendants

21   REPORTED BY:  Louisa B. McIntire-Brooks, RPR, CSR

**EXHIBIT**

9

Charles M. Cohen, Ph.D. (Vol. II) - 12/18/03

48

1    Q    Do you know if that's been done?

2    A    I don't know.

3    Q    Do you know if he's received psychiatric

4  treatment for depression or anxiety?

5    A    No, I don't.

6    Q    How about psychotherapy or cognitive

7  retraining?

8    A    No.  I don't know if he has.

9    Q    I understand.  Do you know if he is taking

10 psychotropic medications at this point?

11   A    No, I don't know.

12   Q    Do you have any opinions with respect to

13 the type of psychotropic medication that will be

14 required?

15   A    Well, I'm not a psychiatrist.  However, I

16 do work with psychiatrists and with MDs and my

17 impression is that he would need an antidepressant

18 medication, perhaps an antianxiety medication, perhaps

19 a combination of the two.

20   Q    Do you have any opinions with respect to

21 the cost of the therapies that you recommended?

49

1    A    Well, yes, I do.  These are based on my

2  experience.  I know, I talked to Mr. Walstra, and I

3  know you had a discussion regarding the figures he came

4  up with.  I don't have those figures right in front of

5  me.  I think the neuropsych was a thousand and I think

6  he told me that the average price of the therapy was,

7  he used $80 an hour.  Those figures in my experience

8  are very conservative and if one would do a more

9  involved study of that, I can assure you that there

10 would be markedly increased prices noted.

11   Q    But, you would agree with me that as far as

12 you know, no physician has ordered any of these

13 therapies for Mr. Liller?

14   A    Well, I do note that there was some

15 recommendations that -- well, it is certainly not

16 recently.  I don't think there is -- well, let me put

17 it this way:  I didn't see anything about another

18 neuropsych being requested or any therapy, no, or

19 medication.

20   Q    Do you know if Michael Liller is currently

21 receiving treatment with a physician for any of his

50

1  complaints related to this accident?

2    A    No, I don't.

3    Q    I note that in your report you say that the

4  goal of the treatments that you're recommending would

5  be to get him back to the functional levels that he was

6  when he left the hospital.  Is it your opinion that

7  Michael Liller's condition has gotten worse since he

8  left the hospital?

9    A    Yes.

10   Q    In what way?

11   A    Compared to the records that I read, this

12 young man appears to be markedly more depressed than

13 was noted previously.  He appears to be suffering from

14 some anxiety.  His cognitive functioning to the limited

15 degree that I evaluated them on the mental status

16 examination appear to be poorer than they were when he

17 left.  He also started drinking again, but indicated

18 that he was in early remission for that.  So, for those

19 reasons, or he appeared to be functioning a good deal

20 poorer than he did when he left the rehab program.

21   Q    Do you have any opinions with respect to

51

1  the significance of Michael Liller's alcohol

2  consumption either pre-accident or post-accident?

3    A    Do I -- what was your question?

4    Q    Do you have any opinions with regard to the

5  significance of Michael Liller's alcohol consumption

6  either before the accident or after the accident?

7    A    Well, before the accident, he indicates

8  that he was clean and sober for eight months.  So, if

9  in fact that is the case, it would -- it would be a

10 positive sign and would not be a negative influence on

11 his condition.  Afterwards, certainly anyone with

12 sustained cognitive disorder shouldn't be drinking.

13 I'm glad to hear, at least he told me at the time, that

14 he had stopped drinking for a month.  And that would

15 again be a positive sign.  Certainly if he had

16 continued to drink, it would be certainly a negative

17 indication.

18   Q    Do you have any opinions with respect to

19 the appropriateness of Mr. Liller's discharge from the

20 Care program?  Let me clarify that.  Was it appropriate

21 to discharge him when they discharged him?

7 (Pages 48 to 51)

Charles M. Cohen, Ph.D. (Vol. II) - 12/18/03

28

1        STIPULATIONS

2        It is stipulated and agreed by and

3 between counsel for the respective parties that the

4 reading and signing of this deposition by the

5 witness be and the same are hereby waived.

6        It is further stipulated and agreed that

7 the filing of this deposition with the Clerk of

8 Court be and the same is hereby waived.

9        - - - - - - -

10 Whereupon,

11        CHARLES M. COHEN, PH.D.,

12 called as a witness, having been first duly sworn

13 to tell the truth, the whole truth, and nothing but the

14 truth, was examined and testified as follows:

15        EXAMINATION BY MS. LUBINSKI:

16    Q    Dr. Cohen, this is just a reminder that

17 you're still under oath.  This is a continuation of

18 your deposition from a few days ago.  You understand

19 that?

20    A    Yes.

21    Q    And I now have the benefit of your CV which

29

1 I did not have the other day.  I'm going to have that

2 marked as, I think, we're on Exhibit Number 3.

3        (Cohen Deposition Exhibit Number 3 was

4 marked for purposes of identification.)

5    Q    The CV which I have, looks like there is a

6 date on the bottom of July 14th, 2003, is that your

7 most current and updated CV?

8    A    I think probably the only change is that

9 under professional organizations, I just dropped out of

10 the APA, American Psychological Association.

11    Q    Why did you do that?

12    A    The dues were prohibitive and I wasn't

13 getting what I felt was appropriate from the

14 organization.

15    Q    Any other additions to your CV or changes?

16    A    I don't think so, no.

17    Q    I have a list of publications.  I

18 understand that a number of these publications may be

19 generally relevant to the opinions that you're going to

20 express today.  Would you characterize any of these

21 publications as being specifically relevant to any of

30

1 the opinions that you hold with respect to this case?

2    A    No, I don't think specifically.

3    Q    What fees do you charge for your hourly

4 review of patients such as the Lillers?

5    A    $200 an hour.

6    Q    What do you charge for time spent in

7 deposition?

8    A    350.

9    Q    How about for time spent testifying at

10 trial?

11    A    350.

12    Q    Of the deposition and trial testimony time,

13 are there minimums associated with those?

14    A    Yes.  Two hours minimum for the deposition

15 or testimony.

16    Q    And if you are providing trial testimony,

17 do you charge for your travel time and waiting time and

18 so forth?

19    A    Yes.

20    Q    Would you describe for clinical practice if

21 you have one?

31

1    A    Well, I have a practice of psychology and

2 rehabilitation counselling.  I see patients.  I do

3 evaluations.  I'm on the staff of Suburban General

4 Hospital.  That's in general what I do.  I testify at

5 hearings, social security hearings as well as other

6 types of legal situations.

7    Q    Do you hold a license in Maryland?

8    A    No.

9    Q    Suburban Hospital that you just referred

10 to, is that a hospital in Pennsylvania?

11    A    Yeah.

12    Q    Do you provide vocational counselling in

13 connection with Pennsylvania's Department of Workers'

14 Compensation Services, whatever that department might

15 be called?

16    A    Counselling services, no.

17    Q    Do you have any affiliation with

18 Pennsylvania's Workers' Compensation Agency?

19    A    Not with the agency itself, no.  I have

20 testified as a vocational and/or psychological expert

21 in workmen's comp cases, however.

2 (Pages 28 to 31)

Charles M. Cohen, Ph.D. (Vol. II) - 12/18/03

32

1   Q   I take it the Pennsylvania system is set up
2 a little bit different from Maryland's?
3   A   Well, I don't know Maryland's system.
4   Q   If you're called as an expert with, let's
5 start with Bruce Liller, if you are called as an expert
6 witness with respect to Bruce Liller's case, what
7 opinions do you expect to offer?
8   A   The opinion would -- I would offer he had
9 the earnings capacity of $23.77 per hour working as a
10 construction supervisor or superintendent. Since the
11 accident, his earnings capacity has been reduced to $15
12 per hour working in the family construction business.
13 He has past and future losses associated with this loss
14 of earnings capacity.
15   Q   Do you feel that a rate of $23.77 an hour
16 is appropriate given the fact that Mr. Liller was not,
17 in fact, earning that rate prior to this accident?
18   A   Yes.
19   Q   Why is that?
20   A   Well, we're talking about earnings
21 capacity. He gives a history of earning $18 an hour in

33

1 South Carolina doing that kind of work. That's in the
2 range appropriate for that kind of job and therefore,
3 we use the mean wage for that kind of work. And that
4 is why it's the appropriate earnings capacity, not --
5 based on his earnings capacity, not on his earnings.
6   Q   Would you agree with me that wages for an
7 employee are based on a number of factors including the
8 particular employee's skills and qualifications?
9   A   Yes.
10   Q   Job performance?
11   A   Yes.
12   Q   You would agree with me doctor that you're
13 not a physician; correct?
14   A   That's correct.
15   Q   And because you're not a physician, you
16 cannot state that any physical complaints Mr. Liller
17 has currently are or are not causally related to the
18 accident?
19   A   That's correct.
20   Q   It's my understanding that Bruce Liller has
21 engaged of his family's construction business has

34

1 engaged a laborer who follows Mr. Liller around and
2 assists him with physical activities that Mr. Liller is
3 unable to perform and that that laborer is paid $8 an
4 hour in order to do that?
5   A   Yes.
6   Q   Is that your understanding?
7   A   That's my understanding.
8   Q   Is it your understanding that that $8 an
9 hour is deducted from Mr. Liller's hourly wage?
10   A   No.
11   Q   This laborer is being paid $8 an hour
12 independent of Mr. Liller's hourly wage of $15 an hour;
13 is that correct?
14   A   That's my understanding.
15   Q   Would you agree with me that it would be
16 possible to have another employee -- well, let me
17 rephrase that. Have you attended any work sites with
18 Bruce Liller?
19   A   No.
20   Q   You have never had the opportunity to see
21 Mr. Liller actually at a construction site?

35

1   A   That is correct.
2   Q   You would not be able to testify with
3 respect to the nature of the work that this laborer is
4 actually performing; is that correct?
5   A   Other than what Bruce told me.
6   Q   Correct.
7   A   Correct. I have no independent knowledge
8 of it.
9   Q   So, you would have no opinions with respect
10 to whether or not it was appropriate to hire an
11 employee specifically to assist Mr. Liller at the job
12 site in that fashion. Is that correct?
13   A   Well again, I have no direct -- I did not
14 observe this. Based on what Bruce tells me would be
15 appropriate.
16   Q   Why is that?
17   A   Well, he indicates that he is supervising
18 on the job, that he goes around and that there is a
19 need for physical activity and when that need arises,
20 he's there as a laborer available to do it.
21   Q   But, you would not be able to say that it

GORE BROTHERS Reporting & Video Co., Inc.
410-837-3027

Towson Reporting Company
410-828-4148

Charles M. Cohen, Ph.D. (Vol. II) - 12/18/03

36

1 would be impossible for one of the other employees of
2 the construction company, someone who was there already
3 and hadn't been hired specifically for that particular
4 purpose to assist Mr. Liller with respect to those
5 physical activities?
6     A    I could not say that. I haven't, as I
7 said, I have not observed him actually on the job or
8 what the other people were doing while he is -- you
9 know, when the laborer is working.
10    Q    Where, Doctor, what is the basis for your opinion
11 that the national average for comparable work would be
12 $23.77 an hour?
13    A    Well, Mr. Walstra and I looked at the
14 national information made available by the federal
15 government and that's the basis of it.
16    Q    Where did you review that information or
17 how did you obtain it?
18    A    Well, that was on the website -- I forget
19 the name of it right now, but it is the national
20 website of the Labor Department of the United States.
21    Q    When I deposed Mr. Walstra on Monday he

37

1 described a computer software program, at least that he
2 has in his office, and I don't know if you also have it
3 available to you, that was provided to him by another
4 vocational counselor and that contains information with
5 respect to wage rates; is that correct?
6     A    I think you're referring to the McKloski
7 program.
8     Q    That's correct.
9     A    I remembered the name of the information.
10 It's from the Bureau of Labor Statistics, the data that
11 we used.
12    Q    Are the Bureau of Labor Statistics that you
13 consulted more or less accurate in your opinion than
14 the information that's contained in the McKloski
15 program?
16    A    Well, I'm not an expert in the McKloski
17 program. It's my understanding that McKloski program
18 actually uses the Bureau of Labor Statistics data.
19 But, then applies some statistical kinds of activities
20 to it to come up with somewhat different data. So, I
21 think it's basically -- the granddaddy, in my opinion,

38

1 the best source, and we use most of the time, are the
2 Bureau of Labor and Statistics data because it's the
3 most comprehensive.
4     Q    Have you done any independent investigation
5 or research into what the prevailing wage rates for
6 comparable work would have been in Oakland, Maryland?
7     A    No.
8     Q    Have you performed any investigation or
9 research into the wage rates in South Carolina for
10 comparable work?
11    A    No. Let me explain. Our rationale, or --
12 certainly my rationale was that this man has
13 demonstrated that he could leave his hometown and go
14 somewhere else to work and, therefore, it appeared to
15 us that using national data and the national average
16 was the most appropriate because he could literally go
17 anywhere in the country. So, that was the basis of not
18 using specific areas of the country.
19    Q    I understand that you interviewed Bruce
20 Liller on the same day that you interviewed Michael
21 Liller; is that correct?

39

1     A    That's correct.
2     Q    Were they both present for each other's
3 interview?
4     A    No.
5     Q    You interviewed them separately?
6     A    That's correct.
7     Q    Was anyone else present while you
8 interviewed Bruce Liller?
9     A    Mr. Walstra was involved in part of the
10 interview. And that's all.
11    Q    The same with Michael Liller?
12    A    That's correct.
13    Q    What did you review in connection with the
14 preparation of your September 15th, 2003 report on
15 Bruce Liller?
16    A    Well, I had -- at the previous time we
17 talked, I reviewed a record by Maryland Orthopedics PA.
18 I think it's Dr. Drapkin. I had that report. I had
19 the State of Maryland motor vehicle accident report. I
20 had a complaint and demand for jury trial. I had
21 Garrett County Memorial Hospital records. I had

4 (Pages 36 to 39)

Charles M. Cohen, Ph.D. (Vol. II) - 12/18/03

40

1 amended notice to take deposition and then there were
2 some tax records.

3    Q    The documents that you just described, are
4 they the totality of the documents and information you
5 reviewed in connection with the preparation of your
6 opinions for Bruce Liller?

7    A    Yes.

8    Q    Would you describe for me the mental status
9 examination that you performed for Mr. Liller?

10   A    Well, what do you mean describe?  I'm not
11 sure what you're asking me.  My mental status exam is
12 in the report.  You certainly don't want me to read
13 that?

14   Q    No.  I'm asking you specifically -- I
15 guess, what are the components of a mental status exam?

16   A    Well, a mental status examination is
17 composed of observations of the client during the
18 examination, a history.  I make judgments about the
19 person's appearance, their issues of eye contact.
20 Their psychomotor behavior, their characteristics of
21 their speech, their affect, their mood, questions about

41

1 appetite, sleep and energy level, issues around
2 hallucinations or illusions or possibilities of those.
3 I make judgments about their stream of thought, their
4 continuity of thought.  I make judgments of the content
5 of their thought, whether there are any suicidal,
6 homicidal or paranoid ideas.  I do some general
7 assessment of their ability to think abstractly.  There
8 are some general kind of questions regarding
9 information.  I measure their orientation, their memory
10 functions, their ability to perform simple arithmetic,
11 their concentration.  I ask questions that evaluate the
12 issues regarding impulse control and judgment.

13   Q    Would it be fair to say, Doctor, that the
14 mental status examination is kind of an ongoing
15 process, it's something that you are -- it's something
16 that is occurring throughout your meeting with the
17 client?

18   A    That's correct.

19   Q    Would it also be fair to say that all of
20 the opinions that you hold essentially with respect to
21 this case are contained in your report of September 15,

42

1 2003?

2    A    Yes.

3    Q    Did you obtain any information from Bruce
4 Liller with respect to the type of construction
5 business that he would hope to go into for himself?

6    A    Well, home construction?

7    Q    Is that the kind of work that he's
8 performing with his family's business?

9    A    Yes.

10   Q    Did you obtain any information with him as
11 to where he would hope to form that business?

12   A    No.

13   Q    Or when he would hope to form it?

14   A    Well, that was -- when -- this was his hope
15 of doing that.  He didn't indicate when he thought he
16 was going to do that in the past or, you know, he
17 didn't give me a projection of when he thought he would
18 have been able to do that.

19   Q    Would you agree with me then that Bruce
20 Liller's hopes of forming a construction business on
21 his own or doesn't really represent a concrete goal at

43

1 this point?

2    A    Oh, I agree with that.

3    Q    Would you tell me, please, Doctor, the
4 basis of your opinion that Bruce Liller would not be
5 able to go to work for a non-family owned construction
6 employer?

7    A    Well, Bruce describes special
8 accommodations or certainly behaviors that would be
9 inconsistent with employment with anyone else other
10 than his father.

11   Q    Specifically what are those behaviors or
12 accommodations?

13   A    Well, certainly having a laborer available
14 to you to follow you around the work site and do the
15 physical activities necessary in the job is something
16 that would, you know, not be possible in any other
17 environment as far as I know.  Also, he talks about
18 having to take frequent breaks throughout the day
19 because of inability to function.  He talks about not
20 being able to work over a 40 hour work week which
21 certainly in any supervisory capacity these jobs often

5 (Pages 40 to 43)

Charles M. Cohen, Ph.D. (Vol. II) - 12/18/03

44

1 -- not often, essentially always require very long
2 hours. He indicates that he also washes his hands
3 numerous times a day. Those would be the reasons.
4    Q    Did you discuss with Bruce Liller any
5 interest he might have in moving to a different
6 occupation?
7    A    No, I didn't.
8    Q    Would that be significant to you in the
9 preparation of your opinions?
10    A    Well, not in this case. This man is
11 working. He is functioning within the structure of his
12 limitations with an employer who happens to be his
13 father. And in terms of the preparation of this
14 report, he is probably earning as much as he could
15 possibly earn at this point as far as I can see.
16    Q    Do you have any opinions with respect to
17 Bruce Liller's life expectancy?
18    A    No.
19    Q    Do you intend to calculate any lost
20 earnings capacity over the course of Mr. Liller's life
21 expectancy?

45

1    A    Well, that's under Mr. Walstra.
2 Mr. Walstra does that. I assume you have talked to him
3 about that.
4    Q    Do you have any opinions with respect to
5 any other health problems which Bruce Liller may have
6 had?
7    A    No.
8    Q    Did you ask him about any?
9    A    He didn't indicate that he had any. I
10 didn't ask him specifically if he had any.
11    Q    Would it be significant to you to learn if
12 he had?
13    A    Well, it could possibly be. You know, the
14 issue is not for rehabilitation specialist, the issue
15 is not what the diagnosis is. The issue is how it
16 affects or how it could affect his functional acts.
17 So, that would be more of the most importance, not what
18 is actually wrong, if anything, else is wrong.
19    Q    Would you agree with me that there are
20 other medical conditions which could be unrelated to
21 the accident which is at issue in this case which could

46

1 affect Mr. Liller's earnings capacity?
2    A    Well, anything is possible. Sure.
3    Q    Did you obtain any information from
4 Mr. Liller with respect to when he intends to retire?
5    A    I didn't.
6    Q    Did you obtain any information from
7 Mr. Liller with respect to his personal spending
8 habits?
9    A    I didn't, no.
10    Q    Do you intend to do any additional
11 investigation or prepare any additional reports with
12 respect to this case?
13    A    Not unless Mr. Phillips asks me to.
14    Q    Have you spoken with Mr. Phillips with
15 respect to whether or not you'll be testifying at the
16 trial of this case live or by videotaped deposition?
17    A    I haven't talked to him about it. I
18 understand there might have been a conversation
19 regarding that with Mr. Walstra.
20    Q    There was. Okay. Let's go to Michael.
21    A    Okay. Hold on. Let me switch gears here.

47

1    Q    Actually, I'm going to mark this real
2 quick.
3        (Cohen Deposition Exhibit Number 4 was
4 marked for purposes of identification.)
5    Q    I have, Doctor, your September 5th, 2003
6 report prepared for Michael Liller.
7    A    Yes.
8    Q    Are all of the opinions that you hold with
9 respect to Michael Liller contained within this report?
10    A    Yes.
11    Q    The mental status examination that you
12 performed for Michael Liller, did that involve the same
13 components that you have already discussed with Bruce
14 Liller?
15    A    Yes, it did.
16    Q    I'm turning now to page six where you
17 discuss Michael's treatment needs.
18    A    Yes.
19    Q    You recommend for Michael Liller a full
20 neuropsychological assessment.
21    A    Yes.

Charles M. Cohen, Ph.D. (Vol. II) - 12/18/03

---

52

1    A    Well, I really have no opinion. I -- it
2 appeared to be appropriate. I would have probably made
3 sure, if I were in charge, that follow-up would have
4 been done on a regular basis. Not just a total
5 release. So, the time of the release may have been
6 appropriate, but for my thinking, there should have
7 been built-in periods where he would return or at least
8 observations be made to see how he actually does after
9 release, not just released to the parents.
10    Q    What kind of follow-up would be required?
11 In other words, would there be follow-up with the
12 neuropsychiatrist, would there be follow-up with -- or
13 I think it was a neuropsychologist.
14    A    Correct.
15    Q    Would there be follow-up with the Care
16 program, the Care program itself, I think, was staffed
17 by RNs and therapists.
18    A    Um hum. Well, the actual people that would
19 do the follow-up is not as important as the system
20 itself. My fielding is that certainly the Care
21 program, it would have been very good for them to do a

---

53

1 systematic follow-up of Michael.
2    Q    Are you able to say or do you have any
3 opinions to a reasonable degree of probability that if
4 Michael Liller had gotten that follow-up therapy
5 following his discharge from the Care program, his
6 condition today would be improved?
7    A    Well, I'd be speculating. One always hopes
8 that it would have improved. I don't know that for the
9 fact. He did appear to improve with the treatment at
10 the Care program. So, one would hope that he would
11 have improved. But, I cannot state that for certain.
12    Q    Do you believe that Michael Liller is at
13 MMI? Do you know what MMI means; Doctor?
14    A    I did. Medical -- at the high point --
15    Q    Maximum medical improvement?
16    A    Yeah, maximum medical improvement. No, I
17 don't believe that. No, I strong -- you know, as my
18 report indicates, I felt that he needed more treatment,
19 a good deal more treatment. So, I do not feel that
20 he's at maximum medical benefit.
21    Q    Do you believe that with the treatment that

---

54

1 you describe in your report, are you able to -- let me
2 rephrase that from the beginning. Considering the
3 treatment that you have described in your report, are
4 you able to say to a reasonable degree of medical
5 probability that Mr. Liller's condition would improve?
6    A    The best I'm willing to say is that I would
7 hope that that would be the case. How much he would
8 improve is another question. Certainly in these cases
9 when there is dramatic brain damage and it's over a
10 year, the functioning in terms of cognitive
11 functioning, you see very little improvement after a
12 year. I think the better hope would be the issues of
13 depression and anxiety hopefully would improve.
14    Q    Is it your opinion that Mr. Liller's
15 depression and anxiety are causally related to the
16 accident?
17    A    Well, it certainly is secondary to the
18 accident. The best judgment of the people who were
19 seeing him was at the most he was mildly depressed
20 early on. The Care program indicated that he did not
21 appear to have any emotional kinds of problems. My

---

55

1 impression is that the depression, anxiety developed
2 afterwards as he found he was unable to function as
3 well as he had hoped. So, I would consider it
4 secondary to the trauma.
5    Q    But, you're not able to say whether or not
6 it was caused by the trauma?
7    A    Well, cause is a difficult statement to
8 make. I would say that it's secondary to. I think
9 that's a better way of describing it.
10    Q    You performed for Michael Liller or you had
11 him take an MMPI?
12    A    Yes.
13    Q    Did you have Bruce Liller take an MMPI?
14    A    No.
15    Q    What was the basis for your decision to
16 have Michael Liller take an MMPI and not Bruce?
17    A    Well, Bruce, in terms of the interview, had
18 only mild indications of depressive kinds of symptoms
19 and it did not appear to me to be worthwhile to spend
20 his time or the money because there wasn't enough
21 evidence to make the MMPI a relevant instrument to give

---

GORE BROTHERS Reporting & Video Co., Inc.
410-037-3027

Towson Reporting Company
410-828-4148

Charles M. Cohen, Ph.D. (Vol. II) - 12/18/03

56

1 him. However, Michael's interview and mental status
2 examination were very significant and I felt that it
3 was more appropriate in this case because of the
4 severity of symptoms that an MMPI be given.
5    Q   Similar to the questions that I asked you
6 with respect to Bruce, did you perform any independent
7 investigation and research with respect to the
8 prevailing wage rates in Oakland, Maryland for
9 comparable work?
10   A   No. My responses would be the same as in
11 Bruce's case.
12   Q   Did you perform any assessments of Michael
13 Liller's vocational skills? Do you understand what I
14 mean by that question?
15   A   Yes, I do. No.
16   Q   Did you investigate whether Mr. Liller
17 would be interested in performing any other kind of
18 work?
19   A   No, I didn't.
20   Q   Or whether he'd be interested in any other
21 kind of occupation?

57

1    A   No. Again, for the same reason. This
2 young man was working within a family business. He had
3 demonstrated a previous ability to work as a
4 construction foreman and at this point he was able to
5 work as essentially as a laborer under special kind of
6 conditions provided by his family.
7    Q   I understand or at least Michael advised
8 you during your interview that his family was expecting
9 for him to take over the family construction business;
10 is that correct?
11   A   Yes.
12   Q   Did he explain to you or do you have any
13 information as to why the expectation was for Michael
14 to take over the business and not Bruce?
15   A   No.
16   Q   Have you reviewed any of the financial
17 information with respect to the family's construction
18 business?
19   A   No.
20   Q   Do you know how many employees, how many --
21 do you know how many employees the company has who are

58

1 not family members?
2    A   No.
3    Q   Would you agree with me that the
4 construction industry is sensitive to economic ebbs and
5 flows?
6    A   Yes.
7    Q   Would you agree with me that workers within
8 the construction industry from time to time are unable
9 to find work because of economic constraints?
10   A   Yes.
11   Q   Did you investigate or do you have any
12 information with respect to whether or not Michael
13 Liller had ever held a comparable position within a
14 non-family owned company?
15   A   My understanding is that he never had.
16 That's frankly one of the reasons why in my opinions
17 that we left his earnings capacity at what his earnings
18 were prior to the injury at $12 an hour. If he would
19 have had a history of working outside of the family
20 business, like his brother did, or in another state or
21 in another part of the country, I would have been more

59

1 willing to state a higher earnings capacity. But, we
2 -- I decided and we decided to take a more conservative
3 point of view and not take into account in terms of our
4 opinion that his earnings would be greater -- that his
5 earnings capacity would be greater than his past
6 earnings or that he could function as an owner of a
7 family business.
8    Q   Would you agree with me that to the extent
9 that it makes a difference, that he was working for a
10 family owned company as opposed to a non-family owned
11 company, that it would be more likely that his wage
12 rate was inflated versus deflated?
13   A   Well, I couldn't say that at all. No, I
14 would have no opinion regarding that.
15   Q   Do you have any opinions with respect to
16 Michael Liller's life expectancy?
17   A   No.
18   Q   Any information with respect to any
19 additional health problems which may have affected his
20 ability or his earnings capacity?
21   A   No.

9 (Pages 56 to 59)

Charles M. Cohen, Ph.D. (Vol. II) - 12/18/03

---

**60**

1    Q    Do you know when Michael Liller expected to
2 retire from working?
3    A    No, I don't.
4    Q    Do you have any information with respect to
5 his spending habits?
6    A    No.
7    Q    Would any of that information be
8 significant to you in the preparation of your opinions?
9    A    Well, they would be more significant to
10 Mr. Walstra.
11        MS. LUBINSKI:  I think that's all I have.
12 Thank you.
13        Dr. Cohen:  Your welcome.  Thanks for
14 getting this done expeditiously.  I appreciate it.
15        MR. PHILLIPS:  Thank you.  Dr. Cohen, stay
16 on the line for a moment.  I want to talk to you after
17 everybody else is gone.  Doctor, you do have the right
18 to read and sign your deposition.  You're probably
19 familiar with this right.
20        THE WITNESS:  Yes.  I waive.
21        (Deposition concluded at 5:00 p.m.)

---

**61**

1 State of Maryland
2 City of Baltimore, to wit:
3        I, Louisa B. McIntire-Brooks, a Notary
4 Public of the State of Maryland, County of Anne
5 Arundel, do hereby certify that the within-named
6 witness personally appeared before me at the time
7 and place herein set out, and after having been duly
8 sworn by me, according to law, was examined by
9 counsel.
10        I further certify that the examination
11 was recorded stenographically by me and this
12 transcript is a true record of the proceedings.
13        I further certify that I am not of
14 counsel to any of the parties, nor in any way
15 interested in the outcome of this action.
16        As witness my hand and notarial seal
17 this 21st day of January, 2004.
18        _____
            Louisa B. McIntire-Brooks
19            Notary Public
20 My Commission Expires:
21 February 2004

---

**62**

1                INDEX
2        Deposition of Charles M. Cohen, Ph.D.
3            December 18, 2003
4
5 Examination by:                    Page
6 Ms. Lubinski                        2
7
8 Exhibit No.                        Marked
9 3.  Cohen's CV                      3
10 4.  B. Lillers psych. eval. form    21
11
12
13
14
15
16
17
18
19
20
21

---

GORE BROTHERS Reporting & Video Co., Inc.              Towson Reporting Company
410-837-3027                                            410-828-4148