```
                IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF MARYLAND


BRUCE ALLEN LILLER, et al

            Plaintiffs

      vs.                              #MJG 02-CV-3390

ROBERT KAUFFMAN

            Defendants and
            Third Party Plaintiffs

      vs.

ROGER LEE HELBIG

            Third Party Defendant
_____/
```

The telephonic deposition of JEROEN WALSTRA was held on Monday, December 15, 2003, commencing at 2:00 p.m., at the Law Offices of Lord & Whip, 36 South Charles Street, 10th Floor, Baltimore, Maryland, 21201, before Paula J. Eliopoulos, Notary Public.

REPORTED BY: Paula J. Eliopoulos

EXHIBIT B

Jeroen Walstra - 12/15/03

2

1  APPEARANCES:
2       ARNOLD F. PHILLIPS, ESQUIRE
         (Via Telephone)
3         On behalf of Plaintiffs
4       JENNIFER S. LUBINSKI, ESQUIRE
          On behalf of Defendant

3

1           STIPULATION
2       It is stipulated and agreed by and between
3   counsel for the respective parties that the filing of
4   this deposition with the Clerk of Court be and the
5   same is hereby waived.
6           - - - - - - -
7   Whereupon,
8           JEROEN WALSTRA,
9   called as a witness, having been first duly sworn to
10  tell the truth, the whole truth, and nothing but the
11  truth, was examined and testified as follows:
12          EXAMINATION BY MS. LUBINSKI
13  Q   It's Mr. Walstra; is that right? Not
14  Doctor?
15  A   That is correct.
16  Q   Doctor, I have a copy of your --
17  A   Mister.
18  Q   I'm sorry.
19      Mr. Walstra, I have a copy of your Amended
20  Notice To Take Deposition.
21      Have you had an opportunity to see that?

4

1   A   Yeah.
2   Q   Okay.
3   A   I don't have it in front of me, but I did
4   see it.
5       MS. LUBINSKI: I'm going to mark that as
6   Number 1.
7       (Walstra Deposition Exhibit Number 1 was
8   marked for purposes of identification.)
9   Q   Do you have a CV?
10  A   Yes.
11  Q   Perhaps after we conclude the deposition,
12  would you be able to fax that to me?
13  A   Yes, I will.
14  Q   And I'll give you that number --
15  A   Okay.
16  Q   -- once we conclude.
17      Have you published anything, Mr. Walstra?
18  A   Yes, I have.
19  Q   Have you published anything which you
20  would consider relevant to the opinions you're going
21  to express today?

5

1   A   Well, it's relevant with respect to
2   forensic economics. Is it relevant directly for this
3   case? I don't think so.
4   Q   Where did you obtain your undergraduate
5   degree?
6   A   At the Academy for Physical Education in
7   The Hague, and that's in The Netherlands.
8   Q   Are you originally from The Netherlands?
9   A   Yes, I am.
10  Q   And where did you obtain your graduate
11  degree?
12  A   At Webster University, St. Louis,
13  Missouri, 1990.
14  Q   And I neglected to ask when you obtained
15  your undergraduate degree?
16  A   That was in 1984.
17  Q   Was that in economics?
18  A   The undergraduate degree?
19  Q   Correct.
20  A   No. That was in physical education.
21  Q   Okay.

Jeroen Walstra - 12/15/03

6

1  A   And then I have a certificate of Dutch in
2  Dutch law in economics from the University of
3  F-U-T-R-E-C-H-T, 1988.
4  Q   What caused you to go from studying
5  physical education to economics?
6  A   My -- actually my degree is in marketing.
7  Q   Which degree is in marketing?
8  A   The Master's Degree.
9  Q   I understand. Okay.
10     From Webster University?
11 A   Correct.
12 Q   So, you hold a Master's Degree in
13 marketing?
14 A   Yes.
15 Q   Other than the certificate which you hold
16 in Dutch law in economics --
17 A   I did what they called post Masters
18 credit at Melhurst (phonetic) College in 1997, which
19 related to vocational economic analysis and testimony.
20     And I have a -- I'm a certified earnings
21 analyst per July 18th, 2002, and that is through the

7

1  professional association named AREA, and that's the
2  American Rehabilitation Economics Association.
3  Q   And did you have to take an exam --
4  A   Yes.
5  Q   -- of some kind to obtain that
6  certification?
7  A   Yes.
8  Q   When did you take that exam?
9  A   On July -- no. That must have been end of
10 May in 2002.
11 Q   Is that a written exam?
12 A   Yes. It's an eight-hour exam.
13 Q   And is the examination administered by
14 the -- by AREA?
15 A   Yes.
16 Q   Did you pass that exam on your first
17 attempt?
18 A   Yes.
19 Q   Other than that certificate, which is a
20 certified earnings analyst, and your certificate in
21 Dutch law in economics, do you hold any other degrees

8

1  with respect to economics?
2  A   No, I don't.
3  Q   Would you give me, please, your employment
4  history beginning with 1990?
5  A   1990? I started working for 3-M Health
6  Care. That's what they call it. Marketing
7  coordinator for surgical products.
8      At the same time, I was adjunct professor
9  for Webster University in The Netherlands where they
10 had a campus and taught market forecasting.
11     And then I continued to work for 3-M until
12 1994 in the Netherlands in Europe.
13     And then I moved to the United States in
14 19 -- end of 1994, Christmas, 1994, to work for 3-M
15 International Business Development. There I worked as
16 a -- worked in planning for exporters and 3-M
17 subsidiaries.
18     Then I moved to the Pittsburgh area after
19 quitting my job at 3-M and became self-employment,
20 because I was already involved in some of the similar
21 activities that we had in terms of forecasting

9

1  earnings through an insurance company, actually, in
2  The Netherlands originally.
3      And with my business partner, Charles
4  Cohen, I set up this consulting business, and we
5  started writing reports for attorneys in 1997
6  regarding losses of earnings in personal injury cases
7  and medical malpractice cases.
8  Q   So, did you leave 3-M in 1997?
9  A   Actually I left in 1996. In the meantime,
10 I did also work with the United Marketing Group, which
11 is a consulting -- small consulting firm.
12     And I sometimes still do things for them
13 on a free-lance basis.
14 Q   What kind of work do you do for them?
15 A   It's consulting with small businesses
16 looking at market forecasting, sales development,
17 market share development, that kind of stuff, whatever
18 comes in as a job.
19 Q   So, just for my own edification, for
20 example, if a company were interested in getting into
21 a different line of business, they might come to you

3 (Pages 6 to 9)

**Page 10**

1  to determine whether or not that would be something
2  that would be profitable?
3     A   Correct. Right. Some kind of assessment
4  that how many units could you -- would you be able to
5  sell into the future and what would the profit be,
6  yeah.
7     Q   And in connection with that kind of work,
8  have you ever worked within the construction industry?
9     A   No, not that I remember. Not a whole lot,
10  no.
11    Q   When you say not a whole lot, do you think
12  that you may have done some?
13    A   Well, some products, but that's a long
14  time ago. I don't even -- I remember that I had to do
15  something in that area with the value of some product,
16  but I do not really remember any more what I did for
17  them right now.
18    Q   Was that with 3-M or as a --
19    A   No. No. That was consulting for United
20  Marketing Group.
21    Q   Okay.

**Page 11**

1     A   Further, I teach. Maybe you want to know
2  that too.
3     Q   Okay.
4     A   At Chatham College. And I teach marketing
5  and business courses. And I also teach as an adjunct
6  at Point Bark College, now called Point Bark
7  University, doing the same thing.
8     Q   Marketing?
9     A   Marketing and international business,
10  yeah.
11    Q   Are you teaching undergraduate or graduate
12  students?
13    A   Both.
14    Q   How did you meet Dr. Cohen?
15    A   Through my wife. My wife is from
16  Pittsburgh, and she knew him. Their families are
17  close.
18    Q   Did Dr. Cohen indicate to you that he was
19  looking for someone with your kind of expertise?
20    A   No. No. No. You know, he's my
21  father-in-law, to be precise.

**Page 12**

1     Q   And you and Dr. Cohen have been in
2  business together since 1997; is that correct?
3     A   Correct.
4     Q   Have you ever done any review work for
5  Mr. Phillips' firm before?
6     A   No. This was the first.
7     Q   Do you review or prepare earnings
8  evaluations or earnings capacity reports for anyone
9  other than Dr. Cohen?
10    A   I do not understand the question exactly.
11    Q   Well, let me take a few steps back to see
12  if we can make it clearer.
13    A   Yeah.
14    Q   You prepared a lost earning capacity
15  report for Bruce Liller and Michael Liller; is that
16  correct?
17    A   Uh huh. Yeah.
18    Q   How is it that you came to do that?
19    A   We introduced our services to attorneys
20  that we can do that as a team. So, he does the
21  vocational and sometimes psychological part, and I do

**Page 13**

1  the economic forecasting in a case.
2     Q   When Mr. Phillips initially contacted your
3  office, did he contact you or Dr. Cohen?
4     A   I do not remember that, if he contacted
5  him or me. I don't know.
6     Q   Typically when you prepare reports of the
7  kind that you prepared for the Lillers, do you prepare
8  them independently based upon your own analysis, or do
9  you prepare them in consultation with Dr. Cohen?
10    A   We do them together mostly. Like in this
11  case, we interviewed both Michael and Bruce together.
12    Q   So, you were both in the room --
13    A   Correct.
14    Q   -- with the Lillers together?
15    A   Correct.
16    Q   Were both of the Lillers together in the
17  room while you were interviewing them?
18    A   No.
19    Q   Just so that we have a clear transcript,
20  Mr. Walstra, I understand that sometimes you
21  anticipate what my question is going to be and you're

Jeroen Walstra - 12/15/03

18

1  Q  Do you hold any licenses --
2  A  No.
3  Q  -- other than your certification?
4  A  Just the certification that we talked on
5  before, about before.
6  Q  Have you ever provided testimony at trial
7  as an expert witness?
8  A  Yes, I have.
9  Q  On how many occasions?
10 A  Four.
11 Q  Were any of those cases in Maryland?
12 A  No.
13 Q  Where were they?
14 A  Pennsylvania.
15 Q  And in those cases, had you been retained
16 by the plaintiff or the defendant?
17 A  Plaintiff.
18 Q  Do you recall the names of the firms who
19 retained you?
20 A  Yes. Do you want to have them?
21 Q  Please.

19

1  A  McClain, John McClain, M-c-C-L-A-I-N,
2  Leger, Andrew Leger, L-E-G-E-R, James Herb, H-E-R-B,
3  and John Goodrich, G-O-O-D-R-I-C-H.
4  Q  Do you know the results of any of those
5  trials, whether or not there was a plaintiff or a
6  defense verdict?
7  A  I know that the John Goodrich case was a
8  plaintiff verdict.
9  Q  Not sure about the rest of them?
10 A  I'm not sure about the rest of them.
11 Well, yeah, actually the McClain case was also a
12 plaintiff verdict. I know that.
13 Q  Have you ever provided any vocational
14 assistance to Pennsylvania's workers' compensation
15 board, whatever they may call themselves?
16 A  No. I don't do vocational work. So, no.
17    (Walstra Deposition Exhibit Number 2 was
18 marked for purposes of identification.)
19 Q  Let's turn now to your reports. Let's
20 start with your report for Bruce Liller. I have a
21 date on that report of September 17th, 2003.

20

1  A  Okay.
2  Q  Do you have that report in front of you?
3  A  Yes.
4  Q  Is that the only report you've prepared
5  with respect to this case?
6  A  Yes.
7  Q  Other than this report, what do you have
8  in your file with respect to Bruce Liller?
9  A  I have Dr. Cohen's report. I have my
10 notes. I have the tax returns.
11 Q  Which tax returns do you have?
12 A  Let me see. 2002, 2000, 1999 and 1998.
13 I'm missing 2001.
14 Q  And if you could, Doctor, when you fax me
15 over a copy of your CV, I'd like to also have a copy
16 of your notes.
17 A  Okay.
18 Q  What kind of information were you
19 interested in obtaining from Bruce Liller which would
20 enable you to provide the opinions that we're going to
21 discuss in a moment?

21

1  A  Well, his date of birth, the date of the
2  accident is crucial, his education, his past work
3  history, his earnings, where he earned that money and
4  what his problems are.
5  Q  And in that regard, feel free to refer to
6  your report obviously, what information did you obtain
7  from Bruce Liller?
8  A  Well, that's the information we obtained
9  from Bruce Liller. So, I'm not sure -- do you want to
10 see where I put that or --
11 Q  Well, I'd like you to elaborate on your
12 report, if you could.
13 A  Okay. So, Bruce is a 20-year-old --
14 28-year-old male, and he had an accident on 4/17/02.
15 His birth date, date of birth was 3/9/1975.
16    He is -- since returning to work on 12/02,
17 he's earning $15 per hour, and he has an assistant who
18 costs $8 per hour to help him do the physical tasks
19 that he can no longer perform.
20    He reports that he started working
21 full-time since February, '03. In his job, he did not

**22**

1  receive fringe benefits. He's a high school graduate.
2  And after the accident, he did not work for eight
3  months.
4      Now -- so, at the time of the injury, he
5  was 27 years old. And looking at his work history and
6  comparing that to Dr. Cohen's report, he could have
7  earned $23.77 per hour, which would give him an annual
8  income of $49,442 per year.
9      After the accident, now he proved that he
10 could earn $15 per hour. Per year, that's 31,200.
11     He is a -- his losses were projected
12 through an age of 67, which is his Social Security
13 retirement age, which would be 39.89 years into the
14 future.
15     I used an interest rate, real interest
16 rate for discounting to net present value of two and a
17 half percent -- I'm wrong -- yeah. And the real wage
18 rate growth was -- that I used was 1.12 percent. That
19 leaves a net discount rate of 1.38 percent.
20     He did not receive fringe benefits, and he
21 is self-employed.

**23**

1   Q   Do you have any information to suggest
2  that Mr. Liller was earning $23 an hour prior to the
3  accident in this case?
4   A   I base my -- the $23 per hour is based on
5  what -- average wages in 2001. And that is something
6  you can find on the BLS Government Web site for first-
7  line supervisors, managers in construction trade.
8      That was the kind of job, according to
9  Dr. Cohen, that he performed. He did not earn -- we
10 did not see records that he was earning $23 per hour
11 before the accident.
12     We do know that he was earning $18 per
13 hour in South Carolina.
14  Q   And is there a reason why you then used
15 the $23 figure rather than the $18 an hour figure?
16  A   Yeah. Because that's what we felt was
17 the -- or I felt too is the wage that he could earn,
18 and that's proven too by what you see right now, that
19 he has a person walking with him to keep up his tools
20 and stuff, that he was paid $8 per hour, and he is $15
21 per hour. So, together that comes very close to the

**24**

1  national average.
2   Q   Well, if Mr. Liller's capacity or earnings
3  capacity prior to this accident was $23 an hour, would
4  it not be significant to you to know why it was that
5  he was not earning $23 an hour?
6   A   People -- people have different wages per
7  hour in different jobs. And the most important thing
8  I think here is what he could be earning and not so
9  much what he is earning at that moment.
10     I think the national average is a better
11 indicator of his earning potential than only looking
12 at his past earnings.
13  Q   Well, would you agree with me that wages
14 differ as between individuals not based on geographic
15 location or the kind of work but also based upon any
16 individual's particular skills and qualifications?
17  A   Correct. Take also into account that his
18 earnings will develop over a lifetime. People have an
19 earnings profile.
20     This is a young individual. And over a
21 lifetime, he will have higher earnings than most

**25**

1  likely about the $23.77.
2   Q   Did you perform --
3   A   From experience, this is an average.
4   Q   Understood.
5      Did you perform any investigation of your
6  own to determine why it was that Mr. Liller was
7  earning $18 an hour in comparison with the national
8  average of $23 an hour?
9   A   No.
10  Q   Did you ask Mr. Liller?
11  A   No.
12  Q   Have you performed any investigation with
13 respect to what the average wage for a comparable
14 position would be in Oakland, Maryland?
15  A   Yeah. But I did not feel that that was
16 relevant, because he showed that he could work in
17 different locations.
18     He also indicated that he was -- wanted to
19 go into business for himself. And that could be
20 anywhere, which he also proved that he did. He did
21 have his own business in South Carolina, if I remember

Jeroen Walstra - 12/15/03

26

1  correctly.
2  Q    What kind of investigation did you perform
3  for -- with respect to Oakland, Maryland?
4  A    I looked into a database for -- well, I
5  assume that's Garrett County?
6  Q    That's correct.
7  A    Yeah. I looked in the database for
8  Garrett County.
9  Q    And what did you determine?
10 A    That wages there were somewhat lower, but
11 I do not have the data in front of me. So, I cannot
12 tell you. But that's what I remember.
13 Q    Did you look on a Web site similar to the
14 one that you have cited in your report?
15 A    For Garrett County?
16 Q    Well, you have --
17 A    For the area there, no, I don't remember
18 doing that.
19 Q    Well, how did you access that information?
20 A    Via the Web site, via the computer.
21 Q    And what Web site was that?

27

1  A    BLS-dot-GOV.
2  Q    And that's the Web site that you have
3  cited in your report?
4  A    Correct.
5  Q    And then I'm asking you did you access a
6  different Web site in order to perform your
7  investigation with respect to Garrett County?
8  A    No. I accessed a computer program.
9  Q    And that's a computer program that you
10 have in your office?
11 A    Correct.
12 Q    Does that print out?
13 A    You cannot print out the pages on which
14 you get those wages, no.
15 Q    You're not able to print from that
16 software program?
17 A    No. No. You can print an analysis, but
18 you cannot print the exact wages that you do. So, you
19 write that down.
20 Q    I see.
21      The database that you maintain in your

28

1  office, is that software that you've purchased from
2  some third party?
3  A    Yes.
4  Q    What's the --
5  A    Actually, no, I didn't purchase it. It
6  was given to me.
7  Q    Who gave it to you?
8  A    McCroskey, Bill McCroskey.
9  Q    Who is Bill McCroskey?
10 A    He is the developer of the software.
11 Q    And does he have a trade name or a
12 business name?
13 A    Yeah. Can you hang on?
14 Q    Sure.
15      (Pause in the proceedings.)
16      THE WITNESS: I thought he did, but he
17 goes by his name, Billy J. McCroskey,
18 M-c-C-R-O-S-K-E-Y, Ph.D.
19 Q    And did he provide you with this program
20 free of charge?
21 A    Yes.

29

1  Q    Does Mr. McCroskey, does he engage in a
2  profession of his own?
3  A    Yeah. He's a -- he does vocational and
4  economic assessments.
5  Q    Work similar to yours and Dr. Cohen's?
6  A    Correct.
7  Q    Why would --
8  A    He's a well-regarded person in the field.
9  Q    I understand.
10      Why would Mr. McCroskey give you what
11 sounds to be a fairly valuable piece of work product
12 to use free of charge?
13 A    Because he wants to sell it, and I
14 participated in a contest, and I won. He gave it to
15 me free of charge for that reason.
16 Q    I see.
17      And is Mr. McCroskey now selling the
18 software to other persons?
19 A    Yes.
20 Q    Like yourself and Dr. Cohen?
21 A    Yes.

8 (Pages 26 to 29)

GORE BROTHERS Reporting & Video Co., Inc.            Towson Reporting Company
410-837-3027                                                     410-828-4148

Jeroen Walstra - 12/15/03

### 30

1  Q  Does the software have a name?
2  A  It's called MVQS Rehabilitation
3  Economists.
4  Q  And is that software that's marketed
5  strictly to professionals in the Pennsylvania,
6  Mid-Atlantic area, or is it a nationwide software?
7  A  It's a nationwide software.
8  Q  Would it be possible to access information
9  about wages in Oakland, Maryland, via any source other
10 than this software program?
11 A  Yes.
12 Q  How would you do that?
13 A  Clicking on the right areas.
14 Q  I'm sorry?
15 A  Clicking on the right areas. What you
16 will find, though, is that the wages are approximately
17 I think 22-1/2 dollars per hour in Garrett for similar
18 job, for like a supervisor in construction trades.
19 Q  When you say by clicking on the right
20 areas, do you mean within a software program?
21 A  Yes.

### 31

1  Q  I was asking if there would be any source
2  of that information other than the software program?
3  A  Oh, yeah. He gets -- yeah. The Bureau of
4  Labor Statistics. That's his source. So, it's the
5  same data, but he gets the rougher, the original data
6  that also the Bureau of Labor Statistics uses.
7  Q  And the Bureau of Labor Statistics are the
8  statistics that are reported in the
9  WWW-dot-BLS-dot-GOV Web site?
10 A  That is correct.
11 Q  Would it be possible to obtain information
12 about wages in Oakland through any other method?
13 A  I wouldn't know how. I typically use the
14 Web site, the BLS-dot-GOV Web site for my information.
15 I think that's a Government source that is reliable.
16 Q  And the wage rate that you quoted for
17 Bruce Liller is for first line supervisors/managers of
18 construction trade; is that correct?
19 A  That is correct.
20 Q  What information did you elicit from
21 Mr. Liller to suggest that that was the appropriate

### 32

1  job classification?
2  A  I based my opinion on Dr. Cohen's report.
3  Q  And Dr. Cohen had advised that the most
4  appropriate job classification was a first line
5  supervisor or manager?
6  A  Of construction trade, yes.
7  Q  Would you agree with me that the
8  construction trade in general is sensitive to economic
9  ebbs and flows?
10 A  Yes.
11 Q  And would you agree with me that the wages
12 that construction workers earn are similarly tied to
13 the state of the economy?
14 A  Yes.
15 Q  Would you agree with me that at many
16 times, construction workers will not work at all
17 because there may not be work available?
18 A  Yes.
19 Q  Do you have any opinions with respect to
20 whether or not Bruce Liller's future projected
21 earnings capacity would be affected by any of those

### 33

1  ebbs and flows we just discussed?
2  A  Sure.
3  Q  What are those opinions?
4  A  They will be affected by ebbs and flows,
5  his earnings, but not his earning capacity.
6  Q  So, his earning capacity would remain at
7  the same figure?
8  A  Well, yeah. If the job is available, he
9  could do it, yes.
10 Q  But you would agree with me that in
11 reality, if this accident had not happened, the job
12 may not have been available? Would you agree with me
13 there, Mr. Walstra?
14 A  You mean at some point in time that he may
15 have less work? Yeah. I mean, he was -- he was
16 self-employed, and the number of hours that he will
17 work will be going up and down, yes. Some weeks he
18 may work maybe 70 hours and another week he may work
19 30 hours.
20 Q  And that's true regardless of whether or
21 not he had been involved in this accident; is that

GORE BROTHERS Reporting & Video Co., Inc.     Towson Reporting Company
410-837-3027                                   410-828-4148

Jeroen Walstra - 12/15/03

### Page 34

1  correct?
2  A   That is correct.
3  Q   Do you have any information with respect
4  to Mr. Liller's personal spending habits?
5  A   No.
6  Q   Do you have any information with respect
7  to -- again, we're talking about Bruce Liller at this
8  point -- with respect to any health conditions which
9  Mr. Liller may suffer from which are unrelated to this
10 accident?
11 A   No.
12 Q   Do you have any information --
13 A   I'm not a medical doctor. So, I would not
14 be able to incorporate that anyway.
15 Q   Well, would it be significant to you if
16 you learned, for example, that a person you were
17 evaluating had a terminal condition?
18 A   If a doctor would state to me that this
19 person is going to die in five years, then that would
20 make a difference if the doctor would tell me that.
21      But this is a hypothetical. Would tell me

### Page 35

1  that it's not related to the incident, yeah, that
2  might affect it. But that kind of information was not
3  available to me.
4  Q   Why was it not available?
5  A   I had not heard of this. It's not
6  available. I have not -- if you say he had a terminal
7  condition --
8  Q   I'm not suggesting he had a terminal
9  condition.
10 A   -- this is the first that I'm hearing of
11 it.
12 Q   I'm not suggesting he had a terminal
13 condition.
14      But would it be significant to you to
15 learn if a hypothetical person had one?
16 A   If the -- yeah, it would be if that would
17 affect -- but then you need -- I need another report.
18 I need somebody, a medical doctor or a vocational
19 expert indicating to what extent that disease that he
20 had prior to the accident would affect his earning
21 capacity.

### Page 36

1  Q   I understand.
2  A   So, in other words, I cannot do anything
3  with that unless there's another person who can make a
4  statement about that.
5  Q   I understand.
6      When you met with Bruce Liller for an hour
7  or so at the time that you prepared this report, did
8  you ask him any questions with respect to his health
9  other than any conditions which he feels are related
10 to this accident?
11 A   No.
12 Q   Have we discussed all the opinions that
13 you hold with respect to Bruce Liller at this point,
14 Mr. Walstra?
15 A   We have not discussed the numbers, if
16 that's what you're referring to.
17 Q   Those are contained within your report?
18 A   They are in the report.
19 Q   Do you hold any opinions with respect to
20 this case that are not contained within your report?
21 A   No.

### Page 37

1  Q   About how much time would you estimate
2  that you spent in the preparation of the report with
3  respect to Bruce Liller?
4  A   Let me look at the -- I'm looking for my
5  invoice. That's why I'm not answering.
6  Q   Take your time.
7  A   I had it on my desk. Bruce Liller is five
8  hours.
9  Q   Does that include the initial hour that
10 you spent meeting?
11 A   That includes interviewing, analysis,
12 review of reports and writing the report.
13 Q   And other than Dr. Cohen's report, the
14 W-2s, or, I'm sorry, the tax returns which you have in
15 your file and your notes, did you review any other
16 materials in connection with the preparation of your
17 report?
18 A   No.
19 Q   Do you know whether you will be called
20 live to testify at the trial of this case?
21 A   If I know, is that what you're asking?

Jeroen Walstra - 12/15/03

**Page 38**

1   Q   Yes. Do you know?
2   A   No, I don't know.
3   Q   Have you been asked to perform any
4   additional evaluation or prepare any addenda to your
5   report?
6   A   No.
7   Q   I think that's probably all I have for
8   Bruce.
9   A   Okay.
10  Q   Turning now to the report which you
11  prepared for Michael Liller. If I could just take a
12  second, I'm going to have that marked, Mr. Walstra.
13      MS. LUBINSKI: I think that's Number 3.
14      (Walstra Deposition Exhibit Number 3 was
15  marked for purposes of identification.)
16  Q   Do you have that in front of you?
17  A   I have.
18  Q   How much time did you spend in the
19  preparation of the Michael Liller report?
20  A   I think that was seven hours.
21  Q   And that included --

**Page 39**

1   A   I do not have the invoice in my file here.
2   Q   Would that have included the time that you
3   spent meeting with the Lillers and reviewing
4   Dr. Cohen's report and so forth?
5   A   Yes.
6   Q   The fees that you're charging with respect
7   to Michael Liller's review and testimony are the same
8   as with Bruce Liller's?
9   A   Yes.
10  Q   Did you perform any independent
11  investigation of Michael Liller's earnings prior to
12  the date of this accident?
13  A   Yes. I knew that he was earning the rate
14  of $12 per hour, which is also indicated in
15  Dr. Cohen's report, and I obviously heard the same
16  story.
17      And -- but now he's earning $8 per hour.
18  Q   Have you reviewed any of Mr. Liller's tax
19  returns?
20  A   Yes.
21  Q   What years?

**Page 40**

1   A   2002, 2000, 1999 and 1998. No. Sorry.
2   I'm looking here at Bruce, his returns.
3       2000, 2001. Did I say 2002?
4   Q   No.
5   A   Let me start again.
6   Q   Okay.
7   A   I looked for Michael Liller at 2002, 2001,
8   2000, 1999 and 1998.
9   Q   And the same as we discussed with Bruce
10  Liller, have you performed any independent
11  investigation into the wage rates for comparable work
12  in Oakland, Maryland?
13  A   Yes, I did. And I accessed the same -- we
14  used the earnings that he has right now, but if you
15  look at similar jobs in the Oakland area, Oakland and
16  Garrett County, then you will find that earnings are
17  around what he was earning.
18  Q   And did you determine that based upon your
19  use of the software Mr. McCroskey provided you?
20  A   Yes. And also the BLS-dot-GOV Web site.
21  Q   What's the basis for your opinion that the

**Page 41**

1   appropriate wage rate for household services is $5.15
2   per hour?
3   A   That's the minimum wage. It's most likely
4   somewhat higher. There's a study, the dollar value of
5   a day by economic demographers that publishes that.
6       And if you see there, the wage rate for
7   administrative tasks that they use as a comparable
8   wage rate would be higher than the $5.15 per hour.
9       So, this is conservative.
10  Q   And what is the basis for your opinions
11  with respect to the projected medical expenses for
12  Michael Liller?
13  A   Dr. Cohen indicated that he -- in his
14  report that he needs a full neuropsychological
15  assessment. He needed psychiatric treatment for his
16  depression and anxiety and -- which would be Zoloft.
17  And some follow-up treatment, including psychiatric
18  office visits once a month for a year, once every
19  three months for two additional years.
20      He needs psychotherapy and cognitive
21  retraining once a week for a year, once every two

11 (Pages 38 to 41)

Jeroen Walstra - 12/15/03

42

1  weeks for another and once a month for a third year.
2      I did not include all the costs that he
3  describes. I did get a price for a neurological
4  assessment. I just looked for Zoloft, I looked on
5  the Web site. I got a price from one of the people
6  that is doing that, a thousand dollars they charge for
7  that.
8      And the follow-up treatment was based on
9  twelve visits at $80 a year -- $80 per visit. So,
10 that's basically for one year, and I discounted it
11 over three years.
12     So, I think that the amount would be
13 higher than the amount that I have here.
14   Q   Wow! I've got so many questions about
15 that, I'm not sure where to start.
16     Do you know if any physician has
17 prescribed any of these treatments or services for
18 Michael Lilley?
19   A   I do not know at this point. I do --
20 psychotropic medication, for example, Zoloft. So, it
21 could be a different kind of medication. And I base

43

1  this on Dr. Cohen's report that he needs that.
2    Q   I understand.
3        You would agree with me, though, that
4  Dr. Cohen is not an M.D.?
5    A   Right.
6    Q   And you would agree with me that an M.D.
7  would have to prescribe Zoloft or any other
8  psychotropic medication?
9    A   I don't know. I mean, you should discuss
10 that with Dr. Cohen.
11   Q   Would you agree with me that because
12 you've done obviously some research into what the cost
13 of this treatment would be --
14   A   Yeah.
15   Q   -- would --
16   A   Yeah, I have this from the Web site called
17 Popular Prescription Drugs-dot-COM.
18   Q   Would you agree with me that Zoloft is but
19 one example of a number of different classes of --
20   A   That's right.
21   Q   -- psychotropic medications which would be

44

1  available?
2    A   That's right.
3    Q   Would you agree with me that within those
4  classes of medications there are I guess what you
5  might call brand name drugs and generic drugs?
6    A   Uh huh. Correct.
7    Q   Would you agree with me that generic
8  medications would be cheaper?
9    A   That's correct.
10   Q   Did you check the price of the generic
11 medication?
12   A   No, I did not.
13   Q   How did you determine the cost of a full
14 neuropsychological assessment?
15   A   We had a quote here from a
16 neuropsychological psychologist.
17   Q   Who was that?
18   A   I don't have it in front of me. I'm
19 sorry.
20   Q   Would you agree with me that different
21 neuropsychologists might charge different sums for an

45

1  assessment?
2    A   Could be.
3    Q   Do you think it would have been prudent to
4  check the cost for such an assessment with more than
5  one provider?
6    A   Sure. Yeah.
7    Q   And the follow-up treatment for three
8  years which you've reduced to present value of $609,
9  is that the course of follow-up psychotherapy that
10 you're referring to?
11   A   No. That -- let me see.
12       Yeah. He needs psychotherapy and
13 cognitive retraining once a week for a year, yes.
14   Q   What is the follow-up treatment for three
15 years that you're referring to?
16   A   Well, I just -- what I did is I did that
17 12 times 80 and discounted that to present value. And
18 I do not have a price for the other expenses.
19       So, therefore -- and the psychotropic
20 medication is calculated over three years. So,
21 therefore, this is, you know, three years.